[No. S109123. June 14, 2004.]

VILLA DE LAS PALMAS HOMEOWNERS ASSOCIATION, Plaintiff and Respondent, v.
PAULA TERIFAJ, as Trustee, etc., Defendant and Appellant.

**COUNSEL**

Law Office of Russell P. Nowell and Russell P. Nowell for Defendant and Appellant.

Jeff Thom for California Council of the Blind as Amicus Curiae on behalf of Defendant and Appellant.

Fiore, Racobs & Powers, Peter E. Racobs and Margaret G. Wangler for Plaintiff and Respondent.

**OPINION**

**MORENO, J.**—Civil Code section 1354, subdivision (a),[1] provides that covenants and restrictions in the declaration of a common interest development "shall be enforceable equitable servitudes, unless unreasonable." Section 1355, subdivision (b), in turn, provides that the declaration may be amended if certain procedures are followed. In *Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361 [33 Cal.Rptr.2d 63, 878 P.2d 1275] (*Nahrstedt*), we construed subdivision (a) of section 1354 and held that covenants and restrictions in the declaration are enforceable "unless they are wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit." (*Nahrstedt, supra,* at p. 382.) The use restriction in that case, a no-pet restriction, was included in a condominium development's originating declaration and recorded prior to the conveyance of any of the units.

The questions we confront in this case are whether use restrictions added to a declaration through an amendment and recorded *after* a homeowner has purchased an individual unit bind such an owner, and whether the rule of *Nahrstedt*—that restrictions in a development's declaration are presumed to

---

[1] All further statutory references are to the Civil Code.

be reasonable and are enforceable unless they are arbitrary, impose an undue burden on the property or violate fundamental public policy (*Nahrstedt, supra,* 8 Cal.4th 361, 386 [33 Cal. Rptr.2d 63, 878 P.2d 1275])—applies to subsequently enacted restrictions. We are also called upon to decide whether the trial court abused its discretion in awarding attorney fees to the homeowners association.

■ We conclude that under the plain and unambiguous language of sections 1354, subdivision (a), and 1355, subdivision (b), use restrictions in amended declarations recorded subsequent to a challenging homeowner's purchase of a condominium unit are binding on that homeowner, are enforceable via injunctive relief under section 1354, subdivision (a), and are entitled to the same judicial deference given use restrictions recorded prior to the homeowner's purchase. We also conclude the trial court did not abuse its discretion in awarding attorney fees to the homeowners association as the prevailing party.

## I. FACTS AND PROCEDURAL HISTORY

Villa De Las Palmas is a relatively small condominium development consisting of 24 units located in a single L-shaped building. There are 12 units each on the top and bottom levels, and all units have either a small patio or a deck, with common walls separating them. The walls, described as "pony walls," initially extend from the unit at full height, and then slope down. Many owners, including defendant Paula Terifaj, do not make Villa De Las Palmas, which is located in Palm Springs, their primary residence, but visit only periodically or seasonally.

The individual condominium units were conveyed to the original grantees in 1962 by recorded grant deeds that contained the development's covenants, conditions, and restrictions, also commonly known as CC & R's. Pursuant to the 1962 deed (Declaration), all grantees were required to execute a management agreement and "covenant and agree to observe, perform and abide by any and all lawful by-laws, rules, regulations and conditions with respect to the use and occupancy of said premises which may from time to time be adopted or prescribed by the Board of Governors constituted in said Management Agreement." Failure to abide by any covenant or restriction in the Declaration could result in forfeiture, and "any owner or occupant of any apartment upon said premises may bring legal action for injunction and/or damages against said defaulting owner . . . ." The Declaration further provided that "[t]he benefits and obligations of this deed shall inure to and be binding upon the heirs . . . and assigns of the respective parties hereto."

Pursuant to the authority granted in the Declaration, the Villa De Las Palmas Homeowners Association (the Association) adopted a rule prohibiting

pets. The unrecorded rule provided: "Pets of any kind are forbidden to be kept in the apartment building or on the grounds at any time." While the exact date of the adoption of the no-pet rule is unknown, it is undisputed that it was in existence when Terifaj purchased her unit. Terifaj, a veterinarian who purchased her unit in 1995, did not receive a written copy of the rule prohibiting pets, but she admitted at trial that she was aware of the no-pet rule when she purchased her unit.

Despite the prohibition on pets, from the time Terifaj purchased her unit until 1998, she visited her unit with her dog Lucy. When Lucy died in 1998, Terifaj acquired another dog, a female boxer, and brought her to the property. Terifaj attempted to have the Association amend the no-pet rule at the Association's 1996 and 2000 general meetings, but was unsuccessful.

The Association repeatedly warned Terifaj that she was violating the rule prohibiting pets on the property and fined her accordingly. Terifaj, however, was undeterred and continued to bring her dog to the development. In response, in August 1999, the Association filed a complaint for injunctive and declaratory relief and nuisance, along with a motion for preliminary injunction, to compel Terifaj to abide by the no-pet rule. The trial court denied the motion for preliminary injunction in October 1999, ruling that it was not convinced the Association would prevail on the merits and that irreparable injury was not evident. The court ordered the case to nonbinding arbitration with a March 8, 2000, completion date.

In the interim between the denial of the preliminary injunction and the completion of arbitration, the members of the Association voted to amend the Declaration. In January 2000, the Association adopted and recorded the Amended and Restated Declaration of Covenants, Conditions and Restrictions (Amended Declaration), which added a no-pet restriction, providing: "No pets or animals of any kind, including without limitation, dogs, cats, birds, livestock, reptiles or poultry, may be kept or permitted in any Apartment or anywhere on the Property." The Amended Declaration further provides that violations of the covenants and restrictions contained in the Amended Declaration are nuisances, and that such violations may be enjoined.

Based on the recorded Amended Declaration, the Association filed an amended complaint alleging the same causes of action and seeking the same relief as the original complaint. Following a bench trial, the trial court ruled in favor of the Association on all causes of action. It found the covenants and restrictions in the Amended Declaration to be enforceable equitable servitudes, granted a permanent injunction against any further violation of the no-pet restriction, and found the violation to be a nuisance. The court awarded the Association $15,000 in attorney fees.

The Court of Appeal affirmed. It concluded that section 1354 "[o]n its face . . . applies to any declaration, regardless of when it is adopted and recorded." Because the no-pet restriction was in the recorded Amended Declaration, it therefore constituted an equitable servitude under section 1354, subdivision (a). Relying on *Nahrstedt*, which the Court of Appeal found governed review of the pet restriction, the court held the restriction was not unreasonable.

We granted Terifaj's petition for review.

## II. DISCUSSION

As a condominium project, Villa De Las Palmas is a common interest development subject to the provisions of the Davis-Stirling Common Interest Development Act (the Davis-Stirling Act or the Act). (§ 1350 et seq.) The Davis-Stirling Act, enacted in 1985 (Stats. 1985, ch. 874, § 14, pp. 2774–2786), consolidated the statutory law governing condominiums and other common interest developments. Under the Act, a common interest development is created "whenever a separate interest coupled with an interest in the common area or membership in [an] association is, or has been, conveyed" and a declaration, a condominium plan, if one exists, and a final or parcel map are recorded.[2] (§ 1352.) Common interest developments are required to be managed by a homeowners association (§ 1363, subd. (a)), defined as "a nonprofit corporation or unincorporated association created for the purpose of managing a common interest development" (§ 1351, subd. (a)), which homeowners are generally mandated to join (*Nahrstedt, supra*, 8 Cal.4th at p. 373).

The Act contains a fairly extensive definitions section, defining as relevant here "governing documents" and "declaration." The declaration is defined as "the document, however denominated, which contains the information re-quired by section 1353." (§ 1351, subd. (h).) Section 1353 requires that declarations recorded on or after January 1, 1986, contain certain information, including the development's covenants and restrictions. The governing documents encompass a broader category of documents, including "the declaration and any other documents, such as bylaws, operating rules of the association, articles of incorporation, or articles of association, which govern the opera-tion of the common interest development or association." (§ 1351, subd. (j).)

The declaration is often referred to as the development's constitution (see Rest.3d Property, Servitudes, § 6.10, com. a, p. 196; 1 Hanna & Van

---

[2] Although Villa De Las Palmas was created prior to the enactment of the Davis-Stirling Act, the Act applies to common interest developments in existence prior to its enactment. (§ 1352; *Nahrstedt, supra*, 8 Cal.4th at p. 378, fn. 8.)

Atta, Cal. Common Interest Developments: Law and Practice (2003) § 22:2, p. 1325) and "establish[es] a system of governance." (*Villa Milano Homeowners Assn. v. Il Davorge* (2000) 84 Cal.App.4th 819, 827 [102 Cal.Rptr.2d 1].) Importantly, it contains the development's covenants and restrictions, which are "enforceable equitable servitudes, unless unreasonable." (§ 1354, subd. (a).) Several provisions of the Act allow for the amendment of the declaration. Of particular relevance here is section 1355, subdivision (b) (hereafter section 1355(b)), which provides in relevant part: "Except to the extent that a declaration provides by its express terms that it is not amendable, in whole or in part, a declaration which fails to include provisions permitting its amendment at all times during its existence may be amended at any time."[3]

Terifaj's argument is somewhat ambiguous with respect to enforcement of restrictions contained in amended declarations. She appears to argue that such restrictions are entirely unenforceable in any manner, but also maintains that such restrictions are not enforceable pursuant to section 1354, subdivision (a), because they do not meet the requirements of equitable servitudes. Since her argument is vague, we address both contentions.

▮ Because we are construing provisions in the Davis-Stirling Act, we briefly recite the rules of statutory construction that will guide our decision. Our primary task in construing a statute is to ascertain the intent of the Legislature. (*Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1253 [135 Cal.Rptr.2d 639, 70 P.3d 1054].) We make this determination by looking to the words used in the statute and giving them their plain meaning. (*Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 358 [127 Cal.Rptr.2d 516, 58 P.3d 367].) " ' "If there is no ambiguity in the language of the statute, 'then the Legislature is presumed to have meant what it said.' " ' " (*Ibid.*)

## A.

▮ We must first decide whether a use restriction contained in an amended declaration is enforceable against a homeowner who acquired his or her separate interest before the challenged amendment was adopted and recorded. As noted above, under the Davis-Stirling Act, a common interest

---

[3] In addition to section 1355(b), the Davis-Stirling Act provides several methods for amending the declaration. Section 1355, subdivision (a), provides that a declaration may be amended pursuant to its own amendment provisions or pursuant to other provisions of the Act; section 1356 allows a homeowners association to petition the court for approval of an amendment if the declaration provides for a larger majority than the association is able to muster, provided at least 50 percent of the owners vote in favor of the proposed amendment; section 1355.5 provides for the deletion of certain developer-oriented provisions; section 1357 provides for the extension of a termination date set forth in a declaration.

development may amend its declaration pursuant to the provisions of the declaration itself or under the provisions of the Act. When a declaration is silent on whether it may be amended, section 1355(b) provides that it may be amended at any time. For the following reasons, we conclude that use restrictions added to a declaration by amendment bind not only subsequent purchasers, but current homeowners as well.

■ This conclusion follows from the plain language of section 1355(b), which provides in part: "For purposes of this subdivision, an amendment is only *effective after* (1) the proposed amendment has been distributed to all of the owners of separate interests in the common interest development by first-class mail postage prepaid or personal delivery not less than 15 days and not more than 60 days prior to any approval being solicited; (2) the approval of owners representing more than 50 percent . . . of the separate interests in the common interest development has been given, and that fact has been certified in a writing, executed and acknowledged by an officer of the association; and (3) the amendment has been recorded in each county in which a portion of the common interest development is located." (Italics added.) Additionally, a copy of the recorded amendment must immediately be mailed or delivered to all homeowners.[4] In short, the statute provides that an amendment is effective after notice of the proposed amendment is given to the homeowners, a majority of the homeowners approve the amendment, and the amendment is recorded. (1 Hanna & Van Atta, Cal. Common Interest Developments: Law and Practice, *supra*, § 22:119, p. 1439; 9 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 25:133, pp. 302–303.)

■ Plainly read, any amendment duly adopted under this subdivision is effective against all homeowners, irrespective of when the owner acquired title to the separate interest or whether the homeowner voted for the

---

[4] Section 1355(b) provides in full: "Except to the extent that a declaration provides by its express terms that it is not amendable, in whole or in part, a declaration which fails to include provisions permitting its amendment at all times during its existence may be amended at any time. For purposes of this subdivision, an amendment is only effective after (1) the proposed amendment has been distributed to all of the owners of separate interests in the common interest development by first-class mail postage prepaid or personal delivery not less than 15 days and not more than 60 days prior to any approval being solicited; (2) the approval of owners representing more than 50 percent, or any higher percentage required by the declaration for the approval of an amendment to the declaration, of the separate interests in the common interest development has been given, and that fact has been certified in a writing, executed and acknowledged by an officer of the association; and (3) the amendment has been recorded in each county in which a portion of the common interest development is located. A copy of any amendment adopted pursuant to this subdivision shall be distributed by first-class mail postage prepaid or personal delivery to all of the owners of separate interest immediately upon its recordation."

amendment. (See, e.g., 1 Hanna & Van Atta, Cal. Common Interest Developments: Law and Practice, *supra*, § 22:119, p. 1439; 9 Miller & Starr, Cal. Real Estate, *supra*, § 25:133, p. 308.) Terifaj's argument that subsequently enacted amendments are not binding on current homeowners runs counter to section 1355(b)'s express language that an amendment is effective upon the satisfaction of the requirements enumerated in that provision. Neither section 1355(b) nor any other provision in the Davis-Stirling Act exempts from compliance with amendments to the declaration homeowners who purchased their individual units prior to the amendment.

■ That is not surprising. To allow a declaration to be amended but limit its applicability to subsequent purchasers would make little sense. A requirement for upholding covenants and restrictions in common interest developments is that they be uniformly applied and burden or benefit all interests evenly. (See, e.g., *Nahrstedt, supra*, 8 Cal.4th at p. 368 [restrictions must be "uniformly enforced"]; Rest.3d Property, Servitudes, § 6.10, com. f, p. 200.) This requirement would be severely undermined if only one segment of the condominium development were bound by the restriction. It would also, in effect, delay the benefit of the restriction or the amelioration of the harm addressed by the restriction until every current homeowner opposed to the restriction sold his or her interest. This would undermine the stability of the community, rather than promote stability as covenants and restrictions are intended to do.

■ Terifaj's position would also, essentially, render meaningless the simple majority vote required for amendments to take effect under section 1355(b). Instead, unanimous consent would be needed, which would often be unattainable. The language of section 1355(b), however, makes clear that a simple majority is all that is required before an amendment becomes effective. One reason for this is because amendment provisions are designed to "prevent[] a small number of holdouts from blocking changes regarded by the majority to be necessary to adapt to changing circumstances and thereby permit the community to retain its vitality over time." (Rest.3d Property, Servitudes, § 6.10, com. a, p. 196.)

Subjecting owners to use restrictions in amended declarations promotes stability within common interest developments. As we observed in *Nahrstedt*, "[u]se restrictions are an inherent part of any common interest development and are crucial to the stable, planned environment of any shared ownership arrangement." (*Nahrstedt, supra*, 8 Cal.4th at p. 372.) Such restrictions may "preclude alteration of building exteriors, limit the number of persons that

can occupy each unit, and place limitations on—or prohibit altogether—the keeping of pets. [Citations.]" (*Id.* at p. 373.) We explained that a homeowners association, "through an elected board of directors, is empowered . . . to enact new rules governing the use and occupancy of property within the [development]." (*Ibid.*) We further observed that "anyone who buys a unit in a common interest development with knowledge of its owners association's discretionary power accepts 'the risk that the power may be used in a way that benefits the commonality but harms the individual.' " (*Id.,* at p. 374, quoting Natelson, *Consent, Coercion, and "Reasonableness" in Private Law: The Special Case of the Property Owners Association* (1990) 51 Ohio State L.J. 41, 67.) A prospective homeowner who purchases property in a common interest development should be aware that new rules and regulations may be adopted by the homeowners association either through the board's rulemaking power or through the association's amendment powers. (See, e.g., Randolph, *Changing the Rules: Should Courts Limit the Power of Common Interest Communities to Alter Unit Owners' Privileges in the Face of Vested Expectations?* (1998) 38 Santa Clara L.Rev. 1081, 1126 ["There is no basis to argue that purchasers of units within common interest communities have an expectation that there will be no changes at all."].)

Finally, section 1355(b)'s legislative history supports the conclusion that all homeowners are bound by amendments adopted and recorded subsequent to purchase. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 736 [3 Cal.Rptr.3d 636, 74 P.3d 737] [court "may observe that available legislative history buttresses a plain language construction"].) Subdivision (b) of section 1355 was not part of the bill enacting the Davis-Stirling Act, but was added three years later in 1988. (Stats. 1988, ch. 1409, § 1, p. 4776 [Assem. Bill No. 4426].)[5] An enrolled bill report from the Department of Real Estate states that "[m]embers of a homeowners' association . . . should not forever be saddled with provisions they desire to change." (Cal. Dept. of Real Estate, Enrolled Bill Rep. on Assem. Bill No. 4426 (1987–1988 Reg. Sess.) Aug. 29, 1988, p. 1.) Significantly, the report recommended approval of Assembly Bill No. 4426, despite acknowledging that current homeowners may have relied on the restrictions in place at the time they made their purchase, stating: "The failure to include a provision for amendment may indicate an intentional omission. Additionally, some changes may provide for inconsistent uses which were not previously permissible. Many owners may have acquired

---

[5] Section 1355(b) initially contained a sunset provision with a termination date of January 1, 1990. In 1993, the Legislature amended the subdivision by deleting the sunset provision. (§ 1355(b), as amended by Stats. 1993, ch. 21, § 1, pp. 134–135.) Section 1355(b), therefore, was inoperative between January 1, 1990 and January 1, 1994.

their interest in the subdivision because of such a restriction limiting use. To permit an amendment would affect their reasonable expectations." (Enrolled Bill Rep. on Assem. Bill No. 4426, *supra*, p. 2.) The Legislature was thus aware that amendments could affect settled or reasonable expectations of some homeowners, but it did not limit the language of section 1355(b) to exempt those homeowners from subdivision (b)'s operation. Tellingly, nothing in the text of section 1355(b) indicates the Legislature intended only subsequent purchasers or homeowners who voted for an amendment to be bound by a use restriction so enacted.

 Section 1355(b)'s express language and the limited legislative history compel the conclusion that all homeowners are bound by amendments made to a declaration pursuant to that section. Accordingly, we conclude that all homeowners are subject to use restrictions contained in amended declarations irrespective of when the amendment was passed.

## B.

To enforce the no-pet restriction in the Amended Declaration, the Association sought injunctive relief under section 1354, subdivision (a) (hereafter section 1354(a)), which provides in relevant part: "The covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable."[6] Terifaj contends that even if subsequently enacted use restrictions promulgated pursuant to section 1355(b) and recorded after a homeowner has purchased property in the development are binding on those homeowners, equitable relief under section 1354(a) is nonetheless unavailable to the homeowners association to enforce such restrictions.

Equitable relief, maintains Terifaj, may not be granted under section 1354(a) in this case because that section requires that a use restriction constitute an equitable servitude in order to be enforceable through injunctive relief.[7] She cites our decision in *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345 [47 Cal.Rptr.2d 898, 906 P.2d 1314] for the applicable California law on equitable servitudes, which she contends is

---

[6] In full, section 1354(a), provides: "The covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the benefit of and bind all owners of separate interests in the development. Unless the declaration states otherwise, these servitudes may be enforced by any owner of a separate interest or by the association, or by both."

[7] Section 1354(a) is found in article 2 of the Davis-Stirling Act, which is entitled "Enforcement."

incorporated in section 1354(a). She maintains the no-pet restriction in this case did not meet the requirements of equitable servitudes, in part, because it was not contained in a document recorded prior to her purchase of a unit in the development, and she did not have notice of the restriction when she purchased the property.

 The Association counters that section 1354(a) applies to all restrictions and covenants in the development's recorded declaration, original or amended, and relies primarily on the Court of Appeal's conclusion that section 1354(a) facially applies to any declaration. The Association contends, and the Court of Appeal concluded, that use restrictions in amended declarations are equitable servitudes because section 1354(a) makes no distinction between restrictions contained in the original declaration and those added to the declaration through amendment. We agree with the Association that section 1354(a) facially applies to all covenants and restrictions in the declaration, irrespective of when such covenants and restrictions were incorporated into the declaration.

 The text of section 1354(a) belies Terifaj's contention that covenants and restrictions must meet the common law requirements of equitable servitudes before they may be enforced against a current homeowner. That section does not provide that covenants and restrictions are enforceable only if they meet the common law requirements of equitable servitudes, but clearly provides that covenants and restrictions in the declaration "*shall be* enforceable equitable servitudes, unless unreasonable" and shall bind all owners. (§ 1354(a), italics added.) This language could mean one of two things, both of which undermine Terifaj's contention. Such restrictions are *deemed* to be equitable servitudes notwithstanding their failure to meet the technical requirements of equitable servitudes; that is, the Legislature has made such restrictions enforceable equitable servitudes by virtue of their inclusion in the declaration. Or, such restrictions may simply be *enforceable in the same manner as* equitable servitudes, with equitable remedies available to the Association, including injunctive relief. Either reading precludes the conclusion that the Legislature intended to incorporate the technical requirements of equitable servitudes into the statute. This interpretation appears compelled by the observation that accepting Terifaj's position would, in effect, nullify the amendment provisions in the Davis-Stirling Act because homeowners could argue, as does Terifaj here, that they did not have notice of the particular use restriction enacted pursuant to those provisions. A homeowners association, thus, would be unable to seek injunctive relief to compel a complaining homeowner to comply with duly promulgated restrictions pursuant to section 1355(b). We do not think the Legislature intended such an anomalous result.

 We therefore agree with the Court of Appeal that section 1354(a) governs enforcement of an amendment to a declaration because that section

does not distinguish between an original and an amended declaration. The Legislature, by using expansive language in section 1354(a), intended all covenants and restrictions in the declaration to be enforceable against all homeowners under that provision. Only if the covenant or restriction in question is unreasonable will it be unenforceable under section 1354(a).

Accordingly, we conclude that section 1354(a) applies to enforcement actions relating not only to the covenants and restrictions in the original declaration, but also covenants and restrictions in any declaration.[8] We are left then with the issue whether the deferential *Nahrstedt* standard of presumptive reasonableness applies to use restrictions adopted and recorded after a challenging homeowner has purchased his or her individual interest.

## C.

 We interpreted section 1354(a) in *Nahrstedt, supra,* 8 Cal.4th 361, and held, pursuant to principles distilled from various authorities and the text of section 1354(a), that covenants and restrictions in recorded declarations of common interest developments are presumptively reasonable (*Nahrstedt, supra,* at p. 380), and are enforceable "unless they are wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit" (*id.* at p. 382).

In articulating the judicial standard of review to be applied to such restrictions, we relied on the language of section 1354(a) and noted that the prior version of section 1354(a) provided that covenants and restrictions in recorded declarations " 'shall be enforceable equitable servitudes *where reasonable*' " (*Nahrstedt, supra,* 8 Cal.4th at p. 380; former § 1355 [Stats. 1963, ch. 860, § 3, p. 2092]), and that the Legislature's use of the double negative "unless unreasonable" in the current version of the statute "cloaked use restrictions contained in a condominium development's recorded declaration with a presumption of reasonableness by shifting the burden of proving otherwise to the party challenging the use restriction." (*Nahrstedt, supra,* 8 Cal.4th at p. 380.)

---

[8] Because the Association amended the Declaration pursuant to section 1355(b) and filed an amended complaint based on the newly enacted and recorded no-pet restriction, we need not decide in this case whether the Association would have been entitled to equitable relief based on Terifaj's violation of the unrecorded no-pet rule passed pursuant to the 1962 Declaration.

The Association contends *Nahrstedt*'s deferential standard applies to subsequently adopted and recorded use restrictions incorporated into a development's declaration. Terifaj disagrees, emphasizing that our conclusion in *Nahrstedt* was based on the fact that the use restriction in that case was contained in a declaration recorded prior to the homeowner's purchase, and relies on our reasoning that "giving deference to use restrictions contained in a condominium project's originating documents protects the general expectations of condominium owners 'that restrictions in place at the time they purchase their units will be enforceable.' (Note, *Judicial Review of Condominium Rulemaking* [(1981)] 94 Harv. L.Rev. 647, 653; Ellickson, *Cities and Homeowners' Associations* (1982) 130 U.Pa. L.Rev. 1519, 1526–1527 [stating that association members 'unanimously consent to the provisions in the association's original documents' and courts therefore should not scrutinize such documents for 'reasonableness'].)" (*Nahrstedt, supra*, 8 Cal.4th at p. 377.)

In *Nahrstedt, supra*, 8 Cal.4th 361, the homeowner, who had three indoor cats, sought to prevent the condominium homeowners association from enforcing a no-pet restriction against her because, she contended, her cats did not make noise and were not a nuisance (*id.* at p. 367), and she had been unaware of the restriction when she purchased her unit (*id.* at p. 369). Applying the deferential standard, we held the no-pet restriction was enforceable because the homeowner failed to meet the burden placed on her, as the party challenging the restriction, to show that the restriction was "unreasonable." (*Id.* at p. 389.)

Unlike in this case, *Nahrstedt* involved a pet restriction contained in a development's originating declaration that was recorded prior to the challenging homeowner's purchase, a fact we emphasized throughout our discussion. Because of that factual difference, much of reasoning in that decision is not necessarily relevant to the resolution of this case. However, *Nahrstedt* does contain reasoning that arguably supports the conclusion that subsequently enacted and recorded use restrictions should receive greater judicial scrutiny. We observed in *Nahrstedt* that other jurisdictions, "lacking . . . legislative guidance," applied some form of reasonableness analysis to use restrictions in common interest developments. Significantly, we noted that some courts applied "the 'reasonableness' standard only to those restrictions adopted by majority vote of the homeowners or enacted under the rulemaking power of an association's governing board, and would not apply this test to restrictions included in a planned development project's recorded declaration or master deed." (*Nahrstedt, supra*, 8 Cal.4th at p. 376.)

We discussed, in particular, *Hidden Harbour Estates v. Basso* (Fla. Dist.Ct.App. 1981) 393 So.2d 637 (*Basso*), in which a Florida appellate court delineated two categories of restrictions—those found in the development's declaration and those later promulgated by an association's board of directors. Restrictions found in the development's declaration are "clothed with a very strong presumption of validity which arises from the fact that each individual unit owner purchases his unit knowing of and accepting the restrictions to be imposed," while restrictions in the second category are subjected to a reasonableness analysis. (*Id.* at pp. 639–640; *Nahrstedt, supra,* 8 Cal.4th at pp. 376–377.) *Basso* imposed a reasonableness analysis to rules promulgated by a board of directors or decisions by the board denying a certain use when the decision falls within the board's authority, explaining the reason for the more stringent standard is "to somewhat fetter the discretion of the board of directors." (*Basso, supra,* at p. 640.) While the *Basso* court spoke of restrictions in the declaration, without distinguishing the original declaration from restrictions subsequently adopted through amendment, the reference to "each individual unit owner" purchasing with knowledge "of and accepting the restrictions to be imposed" (*id.* at p. 639), makes clear that the court was referring to the founding declaration or one in existence at the time of purchase.

We also discussed *Noble v. Murphy* (1993) 34 Mass.App.Ct. 452 [612 N.E.2d 266]. In that case, the original recorded bylaws of a condominium development incorporated the development's rules and regulations, which included a no-pet rule. (*Id.* at p. 270.) In the course of upholding the pet restriction, which had been added to the recorded bylaws prior to the challenging homeowner's purchase of a unit, the court stated that "[a] condominium use restriction appearing in originating documents which predate the purchase of individual units may be subject to even more liberal review than if promulgated after units have been individually acquired." (*Ibid.; Nahrstedt, supra,* 8 Cal.4th at p. 377.)

Based on this discussion and because we explained that our interpretation of section 1354(a) was consistent with "judicial decisions in other jurisdictions that have applied a presumption of validity to the recorded land use restrictions of a common interest development" (*Nahrstedt, supra,* 8 Cal.4th at p. 382, citing *Noble* and *Basso*), we have acknowledged that "some of our reasoning arguably suggested a distinction between originating [covenants and restrictions] and subsequently promulgated use restrictions." (*Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 264 [87 Cal.Rptr.2d 237, 980 P.2d 940].) Our discussion of *Basso* and

*Noble* suggests that we would not necessarily apply the same deferential standard to subsequently enacted use restrictions. For the reasons that follow, however, we conclude that subsequently promulgated and recorded use restrictions are entitled to the same judicial deference accorded covenants and restrictions in original declarations; that is, they are presumptively valid, and the burden of proving otherwise rests upon the challenging homeowner.

Although we discussed and seemingly approved of the distinction drawn in *Basso* between restrictions in the original declaration and those subsequently adopted, we did not hold or state in *Nahrstedt* that we were adopting such an approach. Instead we prefaced our discussion of *Basso* and *Noble* with the caveat that those decisions were from "states lacking . . . legislative guidance." (*Nahrstedt, supra,* 8 Cal.4th at p. 376.) We, however, have been provided guidance by our Legislature through the Davis-Stirling Act, and as the Court of Appeal observed, the statutory language is "controlling." Section 1354(a) unambiguously refers to the "declaration" and provides that the covenants and restrictions in the declaration are equitable servitudes that are enforceable unless unreasonable. It further provides that the covenants and restrictions shall bind all owners of separate interests. (§ 1354(a).) We have previously construed the phrase "unless unreasonable" in section 1354(a) to mean that restrictions in a declaration are enforceable unless they are arbitrary, violate public policy, or impose a burden on the land that outweighs any benefits. (*Nahrstedt, supra,* 8 Cal.4th at p. 389.) This interpretation was governed by the Legislature's use of the double negative "unless unreasonable" in place of the previous phrase "where reasonable." (*Id.* at p. 380.)

While our interpretation was consistent with *Basso, Basso* was not the primary basis for our holding—the statutory language was. As we concluded, "[i]n section 1354, the *Legislature* has specifically addressed the subject of the enforcement of use restrictions that, like the one in this case prohibiting the keeping of certain animals, are recorded in the declaration of a condominium or other common interest development. The *Legislature* has mandated judicial enforcement of those restrictions unless they are shown to be unreasonable when applied to the development as a whole." (*Nahrstedt, supra,* 8 Cal.4th at pp. 388–389, italics added.)

Nor did *Nahrstedt* imply that we would apply a more stringent standard, such as objective reasonableness, to restrictions in recorded amended declarations, as opposed to unrecorded use restrictions promulgated by a board of directors of a homeowners association or other unrecorded rules and regulations. (E.g., *Lamden v. La Jolla Shores Clubdominium Homeowners Assn., supra,* 21 Cal.4th at p. 264; *Rancho Santa Fe Assn. v. Dolan-King* (2004) 115 Cal.App.4th 28, 38 & fn. 2 [8 Cal.Rptr.3d 614].)

Moreover, there is no language in section 1355(b) that indicates a different standard for enforcing its provisions should, or may, apply. (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297] ["It is our task to construe, not to amend, the statute."].) Once the declaration is amended and recorded, section 1354(a) governs its enforcement, and hence, amendments are enforceable unless unreasonable. Had the Legislature intended a different standard to apply to subsequently adopted and recorded use restrictions than applies to restrictions in the original declaration, it would have so provided.

The language of another amendment provision in the Davis-Stirling Act— section 1356, subdivision (c)(5)—demonstrates that the Legislature, if it wished, could have provided that an amendment must be reasonable to be enforceable against a current homeowner under section 1354(a). When the declaration itself provides that it may be amended only with a supermajority vote, section 1356 allows a homeowners association or any homeowner in a common interest development to petition the court for a reduction of the required percentage of votes necessary for the passage of an amendment. (§ 1356, subd. (a).) Pursuant to section 1356, the court may reduce the required minimum percentage of votes needed to amend the declaration, provided a majority of the homeowners approves the amendment and the petition complies with the requirements set out in subdivision (a)(1) through (5). (§ 1356, subd. (a).) Under section 1356, subdivision (c), it is within the court's discretion to approve or deny such a petition, but in order to grant the petition, the court must find, inter alia, that "[t]he amendment is reasonable." (§ 1356, subd. (c)(5).)[9]

No similar limitation was inserted in the text of section 1355(b). Section 1355(b) enumerates the criteria necessary for the amendment of a declaration when the declaration is silent on whether it may be amended, and once the

---

[9] Section 1356, subdivision (c), provides in full: "The court may, but shall not be required to, grant the petition if it finds all of the following: [¶] (1) The petitioner has given not less than 15 days written notice of the court hearing to all members of the association, to any mortgagee of a mortgage or beneficiary of a deed of trust who is entitled to notice under the terms of the declaration, and to the city, county, or city and county in which the common interest development is located that is entitled to notice under the terms of the declaration. [¶] (2) Balloting on the proposed amendment was conducted in accordance with all applicable provisions of the governing documents. [¶] (3) A reasonably diligent effort was made to permit all eligible members to vote on the proposed amendment. [¶] (4) Owners having more than 50 percent of the votes, in a single class voting structure, voted in favor of the amendment. In a voting structure with more than one class, where the declaration requires a majority of more than one class to vote in favor of the amendment, owners having more than 50 percent of the votes of each class required by the declaration to vote in favor of the amendment voted in favor of the amendment. [¶] (5) The amendment is reasonable. [¶] (6) Granting the petition is not improper for any reason stated in subdivision (e)."

requirements are met, including recordation, the amendment becomes effective and binds all homeowners. Given that section 1356 was added to the Davis-Stirling Act before section 1355(b), it is unlikely the omission of a reasonableness standard was an oversight. This point is buttressed by the fact that section 1355, subdivision (a), which provides for amendment of the declaration pursuant to either the amendment provisions in the declaration itself, or pursuant to other amendment provisions in the Davis-Stirling Act, was enacted as part of the original Act, yet it also does not contain a reasonableness element as does section 1356.

### D.

■ Applying the deferential *Nahrstedt* standard of review to the Amended Declaration in this case, we hold, as we did in *Nahrstedt*, that the recorded restriction prohibiting pets is not unreasonable as a matter of law.[10] Terifaj, however, contends that a subsequent amendment to the Davis-Stirling Act, providing in relevant part that "no governing documents shall prohibit the owner of a separate interest . . . from keeping at least one pet" (§ 1360.5, added by Stats. 2000, ch. 551, § 2 [Assem. Bill No. 860]), calls into question *Nahrstedt*'s ultimate holding that the no-pet restriction in that case was not unreasonable. Section 1360.5, however, does not aid Terifaj. As the Court of Appeal observed, subdivision (e) of section 1360.5 clearly provides that its provisions "shall only apply to governing documents entered into, amended, or otherwise modified on or after [January 1, 2001]." The Declaration in this case was amended and recorded in January 2000, a year prior to section 1360.5's operative date. To allow section 1360.5 to undermine *Nahrstedt*'s holding in this case would essentially render section 1360.5's operative date meaningless. Any homeowner could challenge a recorded no-pet restriction on the basis of section 1360.5 without regard to its effective date.

■ Moreover, the fact that the Legislature has passed section 1360.5 does not undermine our conclusion in *Nahrstedt* that a restriction prohibiting pets may be reasonable. By enacting section 1360.5, the Legislature did not declare that prohibiting pets is unreasonable, but merely demonstrated a legislative preference for allowing homeowners in common interest developments to keep at least one pet. As we observed in *Nahrstedt*, prohibiting pets is "rationally related to health, sanitation and noise concerns legitimately held by residents" of common interest developments. (*Nahrstedt, supra*, 8 Cal.4th at p. 386.) While *Nahrstedt* involved a "high-density" project, the concerns expressed in that case apply equally to the present case, which involves a

---

[10] We do not quarrel with Terifaj about the benefits of pet ownership, but that is not the issue in this case. The primary issue in this case is whether subsequently enacted and recorded use restrictions may be enforced against a current homeowner.

smaller development. Therefore, nothing in section 1360.5 undermines *Nahrstedt*'s holding that a no-pet restriction may be reasonable given the characteristics of common interest developments such as condominium projects.[11]

E.

Terifaj contends that even if the recorded no-pet restriction is an enforceable equitable servitude, the trial court erred in awarding the Association attorney fees for prosecuting the original complaint, which was based, according to Terifaj, on the unrecorded and unenforceable no-pet rule. With respect to the original complaint, she contends she was the prevailing party. We conclude the trial court did not abuse its discretion in determining that the Association was the prevailing party (*Heather Farms Homeowners Association v. Robinson* (1994) 21 Cal.App.4th 1568, 1574 [26 Cal.Rptr.2d 758]) and awarding the Association $15,000 in attorney fees. On a "practical level" (*ibid.*), the Association "achieved its main litigation objective" (*Castro v. Superior Court* (2004) 116 Cal.App.4th 1010, 1020 [10 Cal.Rptr.3d 865]) in ultimately securing an injunction to enjoin Terifaj from bringing her dog onto the development. Moreover, Terifaj fails to provide evidence that the trial court actually awarded the Association attorney fees for prosecuting the original complaint. The record discloses the Association sought $19,787 in attorney fees, more than the trial court awarded. Presumably, the court took into account Terifaj's argument regarding the original complaint. In any event, Terifaj fails to establish that the trial court abused its discretion in awarding the Association $15,000 in attorney fees. (See *Rancho Santa Fe Assn. v. Dolan-King, supra,* 115 Cal.App.4th at p. 46.)

---

[11] Terifaj, supported by the California Council of the Blind as amicus curiae, contends that the injunction issued in this case is overbroad and infringes on her civil rights because she is prohibited from inviting to her unit guests who require guide dogs or leasing her unit to an individual requiring a guide dog. This contention is hypothetical since there is no indication the Association will not permit blind persons to use guide dogs on the property. Furthermore, despite Terifaj's implication to the contrary ("the Court of Appeal reasons that the issue of overbreadth does not apply"), the Court of Appeal did not mention, much less address this issue, and Terifaj did not seek rehearing in the Court of Appeal to address this alleged omission. We, therefore, decline to address her contention here. (Cal. Rules of Court, rule 28(c)(2).)

### III. DISPOSITION

For the foregoing reasons, we affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.