[No. A122205. First Dist., Div. One. Feb. 26, 2010.]

CLEAR LAKE RIVIERA COMMUNITY ASSOCIATION, Plaintiff and Respondent, v.
ROBERT CRAMER et al., Defendants and Appellants.

## Counsel

Ewing & Associates and Mike Ewing for Defendants and Appellants.

Abbey, Weitzenberg, Warren & Emery, Lewis R. Warren and Rachel K. Nunes for Plaintiff and Respondent.

OPINION

**MARGULIES, Acting P. J.**—Plaintiff Clear Lake Riviera Community Association (Association) regulates new construction within a common interest development. Defendants Robert and Catherine Cramer (the Cramers) purchased a lot within the development and drew up plans to build a house. In approving their plans, the Association committee with responsibility for plan review applied an Association guideline that limited the height of homes within the development. Because the Cramers' home was located on a sloping lot, compliance with the height guideline depended not only on the height of the structure itself but also its location on the lot.

During construction, it was called to the attention of defendant Robert Cramer (Cramer) that the location he selected for the home would result in a violation of the height guideline, but he disregarded the warnings. When the resulting home exceeded the height guideline by nine feet, the Association filed suit to abate the violation. Finding the Cramers knowingly violated the height guideline, the trial court ordered them to bring their home into compliance. They contend the height regulation was unenforceable because the Association failed to prove it had been properly adopted and the trial court abused its discretion in awarding injunctive relief rather than damages. We affirm.

## I. BACKGROUND

The Association is a nonprofit corporation organized under the Davis-Stirling Common Interest Development Act (Civ. Code, § 1350 et seq.) to manage Clear Lake Riviera (Riviera), a common interest development located in Lake County. In 1992, the Association recorded an amended declaration of covenants, conditions, and restrictions (declaration) governing Riviera. Among other measures, the declaration established an architectural control and planning committee (committee), consisting of three members appointed by the board of directors of the Association (Board). The committee was charged with reviewing the plans for any improvements contemplated within Riviera to ensure they complied with the requirements of the declaration and were "in harmony with the general surroundings of such lot or with the adjacent buildings or structures." In addition, the committee was empowered to enact height restrictions for buildings within Riviera, as well as other restrictions on the size and appearance of Riviera construction. The declaration stated that, once plans had been approved by the committee, "[a]ctual

construction of any improvements . . . must be in strict conformity with said plans."

The committee maintained a set of guidelines that was given to persons who planned to build in Riviera, along with a copy of the Association bylaws and a checklist for application processing. The guidelines described the process of plan approval and contained various substantive regulations governing new construction. Among the guidelines was one limiting the height of structures to a maximum of 17 feet above street level or the "control point" of the lot. For a sloping lot, the control point was the elevation at the center of the lot. Although there was no evidence when and how this guideline was enacted, it had been applied by the committee since at least 1995.

In March 2005, the Cramers submitted to the committee plans for a home they hoped to construct in Riviera. Rather than retain a general contractor, Cramer intended to act as his own builder. The Cramers' plans were approved by the committee in April. Beneath the approval stamp on each page of the plans, the committee had printed, "structure height not to exceed 17 feet from control point of lot." Cramer was aware of the notation and knew the Association's guidelines imposed the height restriction. In a plot plan submitted with his application and approved by the committee, Cramer had placed an asterisk in the middle of the lot map and written "Control Point" and "+17" next to the asterisk.

The evidence was in dispute at trial regarding the exact information and warnings given to Cramer about his compliance with the height restriction. A member of the committee, Curtis Winchester, testified he had discussed lot setbacks and application of the Association's height restriction with Cramer even before his plans were submitted to the committee. Winchester explained to Cramer that he and the committee would have to agree on the location of the lot's control point before the application could be approved and a height variance was unlikely because there were many homes within Riviera on similar upslope lots that complied with the height restriction. Winchester told Cramer it would be necessary to remove a substantial amount of soil from the lot to meet the height restriction, given the particular house design the Cramers had chosen, and Cramer agreed to do the necessary grading of the property.

Cramer acknowledged he was aware of the height guideline, but he testified he was confused about the concept of "control point" and its

measurement and had no knowledge or experience in determining the elevation of buildings. He never personally did the measurements necessary to determine how high his house was. Cramer said he relied on his grading contractor to determine compliance with the height requirement and, in any event, could not have placed the home's foundation any lower because the grading contractor ran into rock that prevented further excavation.[1]

In June or early July 2005, after Cramer had completed grading and installed the wooden forms for his foundation, the committee met with him and two persons working with him to discuss application of the height restriction. The meeting occurred as a result of the complaint of a neighboring homeowner who was concerned from the location of the Cramers' foundation forms that the resulting house would be too tall.

Winchester testified the committee told Cramer at the meeting that if he chose to build at the location of his foundation forms, the planned house would have to be altered considerably to meet height requirements, and they recommended further grading to lower the foundation. At the close of the meeting, Winchester testified, Cramer was noncommittal, but he did not indicate any reservations about complying with the height guideline.

Cramer and one of his contractors disputed this account of the meeting. According to these witnesses, the committee dismissed the neighbor's complaint and told Cramer there was no problem with his construction. As a result of the committee's apparent approval, Cramer testified, he decided soon after to pour the foundation concrete. Cramer denied ever being warned by a committee member prior to the pouring of his foundation that the house would be too high.

In mid-July, the committee sent the Cramers a notice stating that their house appeared to depart from the approved plans and noting the completed building would violate the height restriction in the guidelines. The form requested the Cramers to notify the committee if they could not comply, but they did not do so. The committee sent a similar form in September, after the foundation was poured but before the walls were erected.

It was undisputed that when the Cramers' house was finished, it differed significantly from the house depicted in the approved plans, with one wall

---

[1] The grading contractor directly contradicted this testimony. He denied being responsible for the elevation decision, testifying that Cramer instructed him regarding the depth to grade the hillside, and said his grading was never impaired by rock underlying the soil.

being considerably higher and more massive than shown on the plans. The house exceeded the 17-foot height restriction by nine feet and impinged severely on the views of at least two neighboring homes. In November, after the home was complete, the Cramers unsuccessfully requested a variance from the committee that would have ratified their violation of the height restriction.

In June 2006, the Association filed an action against the Cramers seeking a declaration they were in violation of the guidelines and the approved construction plans, an injunction requiring compliance, and monetary damages. Following a bench trial, the court found for the Association in a statement of decision. The court rejected the Cramers' various arguments that the height restriction was invalid or unenforceable, found the Cramers' home to be nine feet higher than permitted under the guidelines, and concluded Cramer knowingly built the home in violation of the height guideline. Finding the Cramers' home had caused irreparable injury to neighboring homeowners, the court ordered them to bring it into compliance with the guidelines.

## II.  DISCUSSION

■ "Common interest" developments, such as Riviera, "have become a widely accepted form of real property ownership." (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 370 [33 Cal.Rptr.2d 63, 878 P.2d 1275].) "Ordinarily, such ownership also entails mandatory membership in an owners association, which, through an elected board of directors, is empowered to enforce any use restrictions contained in the project's declaration or master deed and to enact new rules governing the use and occupancy of property within the project." (*Id.* at p. 373.) "Use restrictions are an inherent part of any common interest development and are crucial to the stable, planned environment of any shared ownership arrangement." (*Id.* at p. 372.) Use restrictions contained in a recorded declaration are afforded a "presumption of validity" and are enforced unless found unreasonable under a deferential standard. (*Id.* at p. 383.) While use restrictions outside the declaration are not afforded the same presumption of validity, they are nonetheless enforced unless they fail a "straight reasonableness test." (*Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 977 [97 Cal.Rptr.2d 280] (*Dolan-King*).)

### A.  *The Validity of the Height Guideline*

The Cramers do not challenge the trial court's conclusion their home violated the Association's construction guidelines, nor do they contend the height guideline is unreasonable. Rather, they contend "the evidence was

insufficient to support the conclusion that there was a duly adopted and enforceable height restriction."

### 1. *Adoption of the Height Guideline*

The Cramers' primary validity argument is that "[t]here was no showing whatsoever by plaintiff that the [guidelines] were ever adopted <u>by a duly constituted [committee]</u>."

The trial court held that the height guideline was valid and enforceable, a finding that necessarily includes the conclusion the guideline was properly enacted under the Association's rules. We must uphold the trial court's findings of fact if they are supported by substantial evidence. (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159 [84 Cal.Rptr.3d 597, 194 P.3d 330].)

The limited testimony at trial addressing the guidelines demonstrated they were available in printed form at the time the Cramers sought to build, were distributed to all who planned to build in Riviera, were followed by the committee throughout the time in question in evaluating applications, and were believed by committee members to constitute enforceable regulations governing construction at Riviera.[2] There was no evidence when and how the height guideline was enacted, but Winchester testified it had been applied by the committee since at least 1995.

■ While circumstantial, the foregoing provides substantial evidence supporting a finding the height guideline was validly adopted. (See *People v. Lenix* (2008) 44 Cal.4th 602, 627 [80 Cal.Rptr.3d 98, 187 P.3d 946] ["unlike direct evidence, circumstantial evidence does not directly prove the fact in question. Instead, circumstantial evidence may support a logical conclusion that the disputed fact is true."].) The Association's amended declaration was adopted in 1992. Three years later, the committee was enforcing the height guideline. It is a permissible inference from this evidence that the guideline had been properly adopted, since the application of the guideline likely would have encountered resistance had it not been properly adopted. Further support for proper adoption is found in the height guideline's long history of enforcement since that time and the ease with which the Association or the

---

[2] The Cramers claim the introduction of the guidelines as an exhibit at trial was without foundation because they came in through Russell Patterson, who they contend was not an official member of the committee. The trial court did not abuse its discretion in admitting the guidelines because Patterson, whatever his status, was personally very familiar with the activities of the committee.

committee could have repealed the guideline if it had become disfavored by the members or if there were concerns about the propriety of its adoption.

It is true, as the Cramers contend, there was no direct evidence of the guideline's adoption. A witness provided by the Association in response to a trial subpoena testified he could not locate any documents reflecting "the result of any vote of the members of the committee . . . on any rule or regulation involving height." That the Association was unable to locate a document reflecting the adoption of the guidelines, however, does not necessarily support a finding they were not properly adopted. As one committee member testified, the committee operated relatively informally. It did not always keep minutes, and the minutes it kept were not rigorous. Further, the height regulation had been enacted more than 10 years before the trial. In the absence of testimony about the Association's document retention policy, it would not be surprising if documents reflecting adoption of the height guideline had not been retained over that time. Indeed, no written records were produced dating from the era of the guideline's adoption. Under these circumstances, the absence of records regarding the adoption of the guideline does not outweigh the substantial circumstantial evidence supporting its proper adoption.

Accordingly, the Cramers' argument that there was insufficient evidence of proper adoption of the height guideline reduces to the claim the Association was required to prove proper adoption by *direct* evidence, i.e., by a written record reflecting the formal vote of the committee to adopt the regulation, rather than by *circumstantial* evidence. The Cramers, however, present no persuasive argument to support such a conclusion.

It is a truism of the law that facts can be proven by circumstantial as well as direct evidence. (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1210 [114 Cal.Rptr.2d 470, 36 P.3d 11].) The Cramers provide no argument that would differentiate the issue of proper adoption from any other fact in this regard. Indeed, none of the decisions reviewing an action to enforce a common interest development regulation holds the association is required to provide direct evidence that a regulation was properly adopted to prevail. (E.g., *Pacific Hills Homeowners Assn. v. Prun* (2008) 160 Cal.App.4th 1557, 1566 [73 Cal.Rptr.3d 653]; *Rancho Santa Fe Assn. v. Dolan-King* (2004) 115 Cal.App.4th 28, 39 [8 Cal.Rptr.3d 614]; *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 646, 648 [191 Cal.Rptr. 209].) On the contrary, those decisions never address the procedural history of the regulations, and there is no indication in any of them the association provided, or was required to provide, direct evidence the regulation had been properly adopted. In *Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73 [14 Cal.Rptr.3d 67, 90 P.3d 1223], in which the association originally attempted

to enforce such a regulation, the Supreme Court expressly noted there was no evidence regarding the date of its adoption. (*Id.* at p. 80.) Although the regulation was ultimately not enforced, the court did not indicate the regulation would have been found unenforceable merely for the lack of direct evidence about its genesis.

■ The closest arguable authority for such an evidentiary requirement is *Ironwood Owners Assn. IX v. Solomon* (1986) 178 Cal.App.3d 766 [224 Cal.Rptr. 18], which states, "When a homeowners' association seeks to enforce the provisions of its CCRs to compel an act by one of its member owners, it is incumbent upon it to show that it has followed its own standards and procedures prior to pursuing such a remedy, that those procedures were fair and reasonable and that its substantive decision was made in good faith, and is reasonable, not arbitrary or capricious." (*Id.* at p. 772.) In holding an association must show its standards and procedures were followed, however, *Ironwood* was not referring to proof that proper procedures were used for adoption of the guideline. Rather, the "standards and procedures" referred to by *Ironwood* were the internal procedures for *enforcement* of the restrictions, rather than their adoption. (See *Pacific Hills Homeowners Assn. v. Prun, supra,* 160 Cal.App.4th at pp. 1566–1567.)

The Cramers cite *Dolan-King* for the proposition that regulations adopted by an association are not afforded a presumption of reasonableness, but this portion of *Dolan-King* is concerned with the substantive reasonableness of regulations, not their procedural validity. (*Dolan-King, supra,* 81 Cal.App.4th at p. 977.) In any event, there was no need for a presumption of reasonableness here. As discussed above, the trial court was entitled to infer proper adoption from the circumstantial evidence of long enforcement provided by the association. Further, there was no suggestion in *Dolan-King* that the association was required to provide direct evidence its existing regulations had been properly adopted, and there is no indication in the decision such evidence was provided. (*Id.* at pp. 977–979.)

■ Accordingly, we find no legal support for the Cramers' claim that a common interest association is required to provide direct, rather than circumstantial, evidence that its use restrictions were properly adopted in an action to enforce the restrictions.

In arguing the guideline was invalid, the Cramers also cite a resolution passed by the Board in 2000 that rescinded "each and every former Policy & Procedure, Rule & Regulation, and Resolution put into effect prior to January 1, 2000." Because this document was introduced without any foundational testimony, the Board's intent in passing it is unclear. The text of the resolution, however, suggests it was intended to repeal enactments of the

Board itself, rather than those of the committee. Nor does the resolution literally apply to the height restriction at issue here. It does not purport to repeal "guidelines," but only policies, procedures, rules, regulations, and resolutions. Further, regardless of the intent of the Board resolution, there was sufficient time between years 2000 and 2005 during which the committee could have readopted the guidelines, assuming they were ever repealed. Substantial evidence therefore supported the trial court's conclusion that the 2000 resolution did not preclude enforcement of the guidelines.

### 2. *Application of Civil Code section 1357.100 et seq.*

■ Civil Code section 1357.100 et seq. establishes procedural requirements for the adoption of the "operating rules" of a common interest development association. (Civ. Code, §§ 1357.110, subd. (a), 1357.130, 1357.140.) The Cramers contend the height guideline is an operating rule as so defined and was not adopted in accordance with the procedures specified by statute.

We need not decide whether the height guideline is an operating rule. Pursuant to Civil Code section 1357.150, subdivisions (a) and (b), the requirements of these sections apply only "to a rule change commenced on or after January 1, 2004" and do not affect "the validity of a rule change commenced before January 1, 2004." Winchester testified he had been involved with the committee since 1995 and the height restriction had been in effect throughout that time. While the copy of the guidelines in the record bears notations indicating changes had been made around April 2005, the height restriction was not changed by these amendments. Because there was no evidence the height guideline was enacted by a rule change initiated after 2003, it was not subject to section 1357.100 et seq.

### 3. *The Composition of the Committee*

The Cramers also dispute the trial court's finding the committee "was a valid and functioning committee pursuant to and within the scope of the Declaration." The Cramers do not argue the committee failed to hold meetings or otherwise perform its functions, or its actions were arbitrary and not in accord with the governing documents of the Association. Rather, their argument is founded on the testimony of Winchester that, at the time the Cramers' plans were considered, the committee had "four or five" members and, while the committee met every week, not every member attended every meeting. The Cramers also point to evidence indicating the "official" membership of the committee consisted of three particular persons in 2004, and the Board minutes disclosed no action to appoint any other person to the committee. Yet two other persons, Robert Frane and Russell Patterson, purported to act on behalf of the committee and had substantial involvement with the Cramers' application.

Because this issue was not explored at trial, but appears to have arisen as a result of a set of documents produced in response to a trial subpoena, the evidence is not clear on the composition or working of the committee. When Patterson testified at trial as a member of the committee, for example, he was never asked on what authority he believed himself to be a committee member or whether he viewed himself as an official voting member. Given the Cramers' failure to make a complete record on this issue, we are inclined to find the testimony of Patterson alone to constitute substantial evidence to support a finding that he was, indeed, a committee member, despite the lack of any documentary evidence to back his claim.

Yet even if we assume Frane and Patterson were merely volunteers who assisted the official members of the committee, we would find no basis to question the trial court's conclusion that the committee was properly functioning under the terms of the declaration. As the trial court noted in its statement of decision, there is no dispute the committee had been in existence for many years, conducted weekly meetings, and reviewed the planned construction within Riviera, all as required by the declaration. While there is no provision in the declaration for the appointment of "pro tem" committee members, neither does it preclude the practice.

Further, the Cramers cite no prejudice from the participation of the two purportedly unofficial members, who worked with them to bring their construction plans into compliance with the Association's various rules. There is no evidence the Cramers' plans were not reviewed and approved by the three official members of the committee, as required by the declaration. Nor is there any evidence the committee imposed requirements on the Cramers' construction that were outside the guidelines or otherwise unreasonable. On the contrary, the evidence showed the committee's application of the height guideline was consistent with its application to similar lots in Riviera, on which compliant houses had successfully been built. In short, the mere participation of nonappointed persons in the business of the committee, under these circumstances, would not invalidate the committee's official actions.

### 4. *Estoppel*

The Association contends and the trial court held the Cramers are estopped from challenging the validity of the height guideline because they signed a document, required by the Association as a condition of the plan review process, stating they "agree[d] to" the guidelines. Because we conclude the Cramers failed to carry their burden of demonstrating the height guideline is invalid, we need not reach this issue.

## B. *The Trial Court's Grant of Injunctive Relief*

The trial court's judgment finds the Cramers' house is nine feet higher than allowed, orders them to "abate forthwith the foregoing violation," and precludes them "from maintaining any structure on the Subject Property which violates the CC&Rs." The Cramers argue the trial court abused its discretion in "ordering [them] to tear down their house," which, they contend, "was the effect of the mandatory injunction issued by the court." Instead, they argue, the court should have awarded damages.

The testimony of an expert retained by the Cramers does not support their claim that they will be required to tear down their house to comply with the court's order. The expert testified it will be possible to preserve the house, although it will cost at least $200,000 to do so. He recommended removing the house from its foundation, moving it off the lot, lowering the foundation, and remounting the house on the new foundation. Although it might be necessary to "cut [the house] in half" to remove it from the construction site, it need not be destroyed. Nonetheless, although the house need not be torn down, there is no doubt fixing the problem will be expensive and inconvenient, and its cost may exceed the amount of economic harm inflicted by the Cramers on the neighboring properties, at least as measured by the diminution in market value of those properties.

"Ordinarily, when we review a trial court order granting injunctive relief, we apply the deferential abuse of discretion standard. [Citation.] A decision will be reversed for an abuse of discretion only when it exceeds the bounds of reason or disregards uncontradicted evidence. [Citation.] The burden rests with the party challenging an injunction to make a clear showing of abuse." (*In re Lugo* (2008) 164 Cal.App.4th 1522, 1535 [80 Cal.Rptr.3d 521].)

█ We find no abuse of discretion in the trial court's decision to require compliance with the guidelines rather than award money damages. In attempting to find a standard against which to judge the trial court's exercise of discretion, we analogize this case to those requiring the removal of a structure that encroaches on a property line. Although the two situations are not identical, they both raise the possibility that the cost and inconvenience of removal of an existing structure may be disproportionate to the actual damage caused by it.[3] In evaluating the grant of injunctive relief for encroachment, courts apply a three-part test known as the "hardship doctrine." (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 758–759 [110 Cal.Rptr.2d 861].) "To

---

[3] As authority, the Cramers rely largely on *Sharon v. Sharon* (1888) 75 Cal. 1 [16 P. 345], a decision reviewing a trial court's award of temporary alimony. We find the circumstances of *Sharon* sufficiently different from those of the present situation that it provides little clear guidance in reviewing the trial court's exercise of discretion.

deny an injunction [requiring removal of an encroaching structure], three factors must be present. First, the defendant must be innocent. That is, his or her encroachment must not be willful or negligent. The court should consider the parties' conduct to determine who is responsible for the dispute. Second, unless the rights of the public would be harmed, the court should grant the injunction if the plaintiff 'will suffer irreparable injury . . . regardless of the injury to defendant.' Third, the hardship to the defendant from granting the injunction 'must be *greatly disproportionate* to the hardship caused plaintiff by the continuance of the encroachment and this fact must clearly appear in the evidence and must be proved by the defendant. . . .' " (*Id.* at p. 759.)

The trial court found the Cramers' violation of the height regulation to be knowing, rather than innocent. The Cramers argue at length this conclusion was against the weight of the evidence, contending they relied on the committee's conclusion at the June/early July meeting that there would be no violation. As discussed above, the evidence was conflicting on exactly what Cramer was told about the height of his house at that meeting. Evaluating the credibility of the witnesses was the responsibility of the trial court, and it found the Association's witness to be more credible on this issue. Further, we find substantial evidence to support the court's finding that the violation was intentional in the testimony of Winchester, who stated Cramer was told unequivocally that if he built the house where the foundation forms were located it would result in a significant violation, the neighbor who confronted Cramer about the location of his foundation forms, and other Association witnesses who testified Cramer was fully and timely instructed about the proper siting of his home.[4]

In any event, to defeat an injunction under the hardship doctrine the defendant must demonstrate the encroachment was neither willful *nor negligent.* (*Hirshfield v. Schwartz, supra,* 91 Cal.App.4th at p. 759.) There is little question, under even the most generous interpretation of the evidence, the Cramers' violation was negligent. Cramer did not dispute he was aware of the height restriction. He had personally marked the control point and the height restriction on a map of his lot. As the effective general contractor, Cramer was responsible for ensuring his home complied with the height restriction. Yet he testified he never bothered to learn how building height was measured under the guidelines and never, despite the controversy his home caused, personally measured the projected height of his home. In fact, Cramer

---

[4] The Cramers object the trial court did not specifically address in its statement of decision what Cramer was told at the June/early July meeting. In fact, the statement of decision notes that "Mr. Winchester again covered the matter [of the excessive height of the building] with Mr. Cramer and his associates." Regardless of what was said at the meeting, however, there was substantial evidence to support a finding that Cramer's violation of the height guideline was not innocent.

presented no evidence he or his contractors had ever measured the elevation of the home prior to pouring the foundation. Further, no one involved with construction of the home appears to have had responsibility for compliance with the height guideline. Cramer contended the task had been delegated to the grading contractor, but that contractor denied responsibility and said he had been instructed by Cramer on the location of the home. The only conclusion to be drawn from the evidence was that Cramer made no effort to comply with the height guideline, even though he was well aware of the restriction and his neighbors had raised the issue prior to the pouring of the foundation.[5] In light of this clear evidence of carelessness, there is no basis for finding the height violation to have been innocent.

The trial court's finding of irreparable harm was also supported by substantial evidence. Two neighbors testified at trial that their prior unobstructed views had been blocked by the Cramers' home, resulting not only in a diminution in value of their homes but also a substantial loss of their enjoyment in them. Where previously the neighbors were able to enjoy views of the nearby lake, they now saw only the walls of the Cramers' home. For both neighbors, this was compounded by a loss of privacy, since the Cramers' home looked onto theirs. There was a further incommensurable risk in refusing injunctive enforcement of the height violation. If the Cramers were permitted to use the fait accompli of their home's completion to avoid enforcement of the height guideline, the Association would effectively lose the ability to enforce any of its guidelines. Members could build their homes in any manner they pleased, arguing afterward in response to an action to enforce the guidelines that compliance would be unreasonably expensive.

Finally, there was no evidence the cost of correcting the violation would be grossly disproportionate to the hardship caused to the Association. Although there was no estimate of the total diminution in value caused to neighboring homes by the Cramers' violation, one neighbor testified his home's value had been diminished by more than $75,000. Even if that was the only economic damage, the $200,000 required to correct the Cramers' violation would not be *grossly* disproportionate to the loss. As noted above, however, there was also diminution in value to at least one other home, along with damage that is more difficult to quantify. The trial court did not abuse its discretion in directing the Cramers to bring their home into compliance.

---

[5] This carelessness is further confirmed by the scope of the violation. The Cramers' home did not miss the guideline by a trivial amount, as one might expect if they made a good faith effort to comply. It is *nine feet* over the limit.

## III. DISPOSITION

The judgment of the trial court is affirmed.

Dondero, J., and Banke, J., concurred.