[No. E034859, E035284. Fourth Dist., Div. Two. July 13, 2005.]

BEAR CREEK MASTER ASSOCIATION, Plaintiff and Respondent, v. PARLAN L. EDWARDS et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III, IV, V and VI.

## COUNSEL

Law Office of Lucia Enriquez, Lucia Enriquez; Quinn Emanuel Urquhart Oliver & Hedges and John S. Gordon for Defendants and Appellants.

Fiore, Racobs & Powers, Peter E. Racobs and Michelle A. Buchmeier for Plaintiff and Respondent.

## OPINION

**WARD, J.**—Defendants and appellants Parlan L. Edwards and Gloria Renico Edwards, as trustees of the Parlan L. Edwards and Gloria Renico Edwards Family Trust (the Trust), appeal from a judgment in favor of plaintiff and respondent Bear Creek Master Association (Bear Creek), on Bear Creek's action for breach of contract and foreclosure. Although both Edwardses are named trustees of the trust, the primary actor throughout has been Parlan L. Edwards; for convenience, therefore, we refer to Edwards in the singular, as the representative of the Trust and as the person who performed most of the salient acts on defendants' behalf.

Edwards and the Trust also appeal postjudgment orders for attorney fees and requiring them to post additional security pending appeal.

The key issue in the appeal is whether a homeowners' association may charge homeowners' association dues or assessments for unbuilt property within a planned and partially built homeowners' association development. The Trust's parcel was planned for eight condominium units, out of a phase of 16, but none of the units on the Trust's portion of the property had actually been constructed. This dispute arose because the Trust failed to pay homeowners' association assessments; indeed, it refused to do so on the theory that assessments are chargeable only to a condominium unit, but that there were no built-out units on the Trust's property.

As we shall explain below, we affirm the judgment and the postjudgment orders.

## FACTS AND PROCEDURAL HISTORY

Bear Creek is the master homeowners' association for the master Bear Creek development. Country Club Villas (CCV) is the homeowners' association, or subassociation, within the Bear Creek master development. The property at issue is located within the CCV subassociation area within the Bear Creek master development. The property comprises what is described as units 9 through 16 of phase IV of the CCV subassociation. Units 9 through 16 were eight unbuilt condominium units within CCV phase IV. Sixteen condominiums were originally designed for CCV phase IV; eight condominiums were built in "pods" of two units each, but the remaining eight units, comprising units 9 through 16, were never constructed.

A company called Watt Bear Creek had owned units 9 through 16 of CCV phase IV, but lost title to that property through foreclosure. The property was acquired by Bear Creek Limited, which was owned by Bill Johnson. Edwards apparently lent a sum of money to Johnson, which Johnson failed to repay.

At the time that Edwards lent the funds to Johnson, he did not further investigate the status of Johnson's property; he simply relied on Johnson's representation that the property was worth twice the amount borrowed. He did no research in the Riverside County Assessor's Office, he did not research recorder's office records regarding the property, and he never read the Bear Creek covenants, conditions, and restrictions (CC&R's) applicable to the property. Edwards testified that he had purchased numerous properties in the past and that he was familiar with title reports, but that he did not review any title report on the property before lending to Johnson.

Johnson defaulted on the Edwards loan, and Edwards foreclosed. Again, before foreclosing and taking title to the property, Edwards did not check the assessor's records, did not check the recorder's records, and did not obtain a title report. Edwards foreclosed on the property and took title for the Trust in approximately December 1997. Edwards's attorney, Lucila Enriquez, telephoned the Bear Creek property manager in January 1998 to explain that Edwards was now the owner of units 9 through 16 of CCV phase IV. Attorney Enriquez told the property manager that she was representing Edwards in connection with his ownership of the lots, and advised that she and Edwards had had some difficulty accessing the property. She followed up the telephone conversation with a copy of the title document showing the transfer from Johnson to Edwards.

The deed giving title to Edwards, on behalf of the Trust, listed Attorney Enriquez's address as the address to which the recorded deed was to be mailed. It was to Attorney Enriquez's address, therefore, that Bear Creek sent various notices to Edwards, as owner of units 9 through 16 of CCV phase IV.

Among other things, Bear Creek mailed homeowners' association ballots and notices of association assessments to Edwards, always to Attorney Enriquez's address. As already noted, Attorney Enriquez herself had telephoned Bear Creek's property manager in January of 1998 to inform Bear Creek that the Trust had acquired ownership of the property. The homeowners' ballots for each of the Trust's units were voted and returned. The ballots included a space to write in the owner's address; except in two instances in which the address space was left blank, the voted ballots that Edwards returned all gave Attorney Enriquez's address as the owner's address.

Bear Creek also sent notices of delinquent homeowners' association assessments for the units, and notices of intent to file a lien. These notices were sent both by first class mail and by certified mail with return receipt requested, to the Trust at Attorney Enriquez's address. The certified mail envelopes were returned unclaimed, but the first class mail was not returned by the post office.

Before Bear Creek filed the instant suit, no one had ever informed Bear Creek that Attorney Enriquez was not authorized to receive communications from Bear Creek at her address. Normally, if a property owner wishes to change its address of record with Bear Creek, the owner notifies the property manager in writing. The property manager never received such a notification with respect to units 9 through 16 of CCV phase IV.

Bear Creek adduced evidence that it had charged association assessments to prior owners of units 9 through 16, even though those eight units were unbuilt. Bear Creek also charged assessments to other unbuilt units within the Bear Creek master development. The triggering event is when one unit in a phase is sold; after that, assessments are charged to each unit in the phase. Bear Creek consistently charged such assessments against every unit in a phase which had sold one property, and had done so regardless of whether the unit consisted of a house, townhouse, condominium, or unbuilt structure.

Edwards testified that he believed the assessments, under the CC&R's, applied only to "condominiums." Inasmuch as there were no condominium buildings on his property, he took the view that he had no duty to pay the assessments. He further testified that he also believed that he had no right, as he owned no "units" or "condominiums," to vote in homeowners' association elections. He claimed that Bear Creek had erred in sending him any homeowners' association ballots, but that he had voted the ballots only to "protect" himself. The day following this testimony, however, Edwards executed a proxy with respect to the Bear Creek election for three members of the board of directors, and cast 24 ballots (three for each unit of his property) in that

election. Edwards did not deny sending the proxy, but testified that he had immediately sent a revocation of the proxy "[t]o the same man I sent the proxy to."

In December 1998, Edwards executed a deed of trust on the property in favor of Attorney Enriquez; this transaction was to secure payment of Enriquez's attorney fees in representing Edwards in various matters concerning the property; Edwards had encountered numerous difficulties in getting the property ready to develop. Among other things, he learned after he had acquired the property that tax assessments were delinquent.

Edwards gave evidence that he and Attorney Enriquez had had difficulty gaining access to the Bear Creek development, a gated community. Edwards spoke to an onsite employee to apply for vehicle stickers for his and Enriquez's cars. In the vehicle permit application, Edwards requested that stickers for his and his wife's cars be mailed to his business address. He testified that he duly received the vehicle permits, and never thought to do anything else about changing his record address with the property manager.

In any event, Bear Creek charged assessments and sent notices for these assessments to Edwards at Attorney Enriquez's address. Edwards disputed the legality of the assessments, inasmuch as there were no built-out structures corresponding to units 9 through 16 of CCV phase IV. Bear Creek sent notices of delinquency, filed lis pendens until its lien could be established, and filed the instant action for, among other things, judicial foreclosure, foreclosure of an equitable lien, and breach of contract. Edwards answered on October 13, 2000. (Edwards also filed a cross-action which was later dismissed as to Bear Creek—as a sanction for discovery abuses—and apparently transferred to a different court to be consolidated with a different action involving different parties. The cross-complaint is not in issue on this appeal.)

After considerably protracted and contentious pretrial proceedings, trial began on May 27, 2003. The court exercised its discretion to try the equitable issues and questions of law first, to the court, reserving jury trial for the common law issues, if any remained.

The trial proceeded normally for the first two days. On the third day of trial, Attorney Enriquez did not appear. Edwards, who had been traveling with her, reported that Enriquez had suffered chest pains while en route to court that day, and went to the emergency room for evaluation. On the following day, a Friday, Enriquez again did not appear. She sent a letter and a note to the court by fax, after normal business hours. The note stated that Enriquez was placed on a 60-day medical leave for further evaluation, but the note was not signed under oath and gave no details of Enriquez's medical condition.

The following Monday, June 2, 2003, the court ordered Attorney Enriquez to appear by June 5, 2003, or to submit a sworn declaration of a physician explaining why Enriquez had failed to appear in court. Enriquez instead filed a request for a continuance of the trial for 60 days for claimed medical disability. Enriquez averred that she was completely debilitated and could not "function in day to day activities." She also appended a doctor's letter, which stated only vaguely that Enriquez's condition was being "worked-up," and that "[d]epending on the outcome of the work-up, she may return to work prior to or after the estimated sixty-days period." This letter was unsworn and provided no intelligible information on Enriquez's medical condition.

On June 5, 2003, the date set to resume trial, neither Attorney Enriquez nor Edwards appeared. The court therefore ordered a postponement of the trial until July 30, 2003 (approximately 60 days from the onset of Attorney Enriquez's alleged medical disability). The order advised both Enriquez and Edwards that, if Enriquez was medically unable to resume trial on July 30, 2003, Edwards should be prepared to go forward with new counsel; the 60-day continuance should afford Edwards sufficient time for new counsel to prepare to proceed.

On July 30, 2003, Attorney Enriquez again failed to appear. A new attorney, Carter F. Johnston, appeared on Enriquez's behalf. This time, Attorney Enriquez averred that she may have suffered a small stroke four or five days earlier. This claim was supported only by unsworn doctors' statements, despite the court's earlier order that Enriquez must present verified evidence of her medical condition, substantiating her incapacity to appear at trial.

Attorney Johnston also claimed that he was unprepared to proceed with the trial on July 30, 2003, despite the court's express direction to Attorney Enriquez to inform her client (Edwards) of the need to proceed without fail on that date, and to obtain new counsel if necessary to do so. The court denied Attorney Johnston's request for a further continuance. The highly unusual circumstances of Attorney Enriquez's absenting herself from court in the midst of trial, without providing verified evidence of any medical disability or incapacity, resulted in an order for sanctions, which has been reviewed in a separate appeal. (*Bear Creek Master Association v. Edwards* (Sept. 21, 2004, E034591) [nonpub. opn.].)

The case then proceeded on July 30 and 31, 2003. The court issued a statement of decision, finding in favor of Bear Creek on both the judicial and equitable foreclosure causes of action. Because no triable issues of fact remained with respect to any alleged breach of contract, the court also granted Bear Creek's motion for a directed verdict on that cause of action.

The court thereupon gave judgment for Bear Creek in the amounts requested. The court further found that Bear Creek was the prevailing party and thus entitled to attorney fees.

Edwards moved for a new trial. This was apparently denied, and Edwards filed a notice of appeal from the judgment.

Bear Creek submitted a motion for attorney fees; Bear Creek then moved to amend the judgment to include both the attorney fees and costs award and an amount previously ordered as sanctions. The court signed the judgment as amended.

Bear Creek then objected to the amount of the undertaking Edwards had posted before taking an appeal; inasmuch as the judgment had been substantially increased by the addition of the attorney fees and costs award, Bear Creek asked the court to order Edwards to provide an increased undertaking on appeal. The court found that the undertaking already deposited was insufficient, in light of the amounts added to the judgment for attorney fees and costs, and ordered Edwards to deposit additional funds for the undertaking on appeal. Edwards filed a second notice of appeal, encompassing the award of attorney fees and costs as well as the requirement of an additional undertaking on appeal.

This court eventually consolidated these two appeals.

## ANALYSIS

Edwards raises a plethora of issues, some of which are duplicative, and none of which has merit, with only one possible minor exception.

### I. *Edwards Was Required to Pay Assessments, Notwithstanding the Absence of an Actual Structure on the Property*

Edwards's primary contention throughout the action was that assessments pertain only to a "condominium," and that a "condominium" must contemplate an actual, existing structure. In the absence of a building or structure, no duty to pay assessments arose under either statutory law or under the Bear Creek CC&R's. Edwards thus argues, first of all, that the court erred in denying his motion for a directed verdict on all causes of action. He asserts that Bear Creek could not prove an essential element of all the causes of action: to wit, the existence of a "condominium."

A. *The Davis-Stirling Act Defines a "Condominium" as "Space" Described in a Qualifying Instrument*

Edwards insists that "[v]acant land is not a condominium." This claim is based upon a proposed construction of the relevant statutory authority and, to some extent, of the Bear Creek CC&R's. The construction of both statutes and contractual documents presents questions of law, which we review de novo. (*Regents of the University of California v. Superior Court* (1999) 20 Cal.4th 509, 531 [85 Cal.Rptr.2d 257, 976 P.2d 808]; *Morgan v. City of Los Angeles Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843 [102 Cal.Rptr.2d 468].)

Civil Code section 783 was enacted in 1963. (Stats. 1963, ch. 860, § 1, p. 2090.) It defined a condominium as "an estate in real property consisting of an undivided interest in common in a portion of a parcel of real property together with a separate interest in space in a residential, industrial or commercial *building* on such real property, such as an apartment, office or store." (Italics added.) An amendment in 1969 did not alter this language in the statute. (Stats. 1969, ch. 275, § 1, p. 624 [amending the description of a possible condominium interest from an "estate for years" to an "estate for years, such as a leasehold or subleasehold"].)

In 1984, however, the definition of a "condominium" was changed considerably. Civil Code section 783 was amended to read: "A condominium is an estate in real property consisting of an undivided interest in common in a portion of a parcel of real property together with a separate interest in space, *the boundaries of which are described on a recorded final map, parcel map, condominium plan or other document in sufficient detail to locate all boundaries thereof. The area within such boundaries may be filled with air, earth, or water or any combination thereof and need not be physically attached to the land except by easements for access and, if necessary, support.* The description of such space may refer to (i) boundaries described in the recorded final map, parcel map, condominium plan or other document; (ii) physical boundaries, *either in existence, or to be constructed,* such as walls, floors and ceilings of a structure or portion thereof; (iii) an entire structure containing one or more separate interests in space; or (iv) any combination thereof. The portion of the parcel of real property held in undivided interest may be all of the real property of an existing parcel or lot (except for the separate interests in space) or may include a particular three-dimensional portion thereof, the boundaries of which are described on a recorded final map, parcel map, condominium plan or other document. The area within the boundaries may be filled with air, earth, or water, or any combination thereof, and need not be physically attached to land except by easements for access and, if necessary, support. A condominium may include

in addition a separate interest in other portions of such real property. . . ." (Italics added.) Civil Code section 1350 was amended to reflect that, "As used in this title unless the context otherwise requires: [¶] 1. 'Condominium' means a condominium as defined in Section 783 of the Civil Code. [¶] 2. 'Unit' means the elements of a condominium which are not owned in common with the owners of other condominiums in the project. [¶] 3. 'Project' means the entire parcel of real property divided, or to be divided into condominiums, including all structures thereon. [¶] 4. 'Common areas' means the entire project excepting all units therein granted or reserved. . . ." (Stats. 1984, ch. 291, § 2, p. 1518.)

Thus, we see that "condominium" was radically redefined to mean a *separate interest in space*, within boundaries described by certain qualifying documents. The space may consist of air, earth or water, or any combination of these things, so long as the boundaries of that space are adequately described in the proper recorded document. There was no longer any requirement for an existing building or structure as a defining characteristic of a condominium.

In 1985 (effective in 1986), the Legislature enacted the Davis-Stirling Common Interest Development Act (the Davis-Stirling Act). (Stats. 1985, ch. 874, § 14, p. 2774.) To accomplish this, the Legislature repealed Civil Code section 783, and enacted a new Civil Code section 783 (Stats. 1985, ch. 874, §§ 8, 9, p. 2772), reading as follows: "A condominium is an estate in real property described in subdivision (f) of Section 1351." In other words, the definition of "condominium" was transferred from Civil Code section 783 to Civil Code section 1351, subdivision (f).

The Legislature also repealed title 6 of part 4 of division 2 of the Civil Code (beginning with § 1350), and enacted replacement provisions (the Davis-Stirling Act). New Civil Code section 1351, subdivision (f), defines a condominium as: "an undivided interest in common in a portion of real property coupled with a separate interest in space called a unit, the boundaries of which are described on a recorded final map, parcel map, or condominium plan in sufficient detail to locate all boundaries thereof. The area within these boundaries may be filled with air, earth, or water, or any combination thereof, and need not be physically attached to land except by easements for access and, if necessary, support. The description of the unit may refer to (1) boundaries described in the recorded final map, parcel map, or condominium plan, (2) physical boundaries, either in existence, or to be constructed, such as walls, floors, and ceilings of a structure or any portion thereof, (3) an entire structure containing one or more units, or (4) any combination thereof. The portion or portions of the real property held in undivided interest may be all of the real property, except for the separate

interests, or may include a particular three-dimensional portion thereof, the boundaries of which are described on a recorded final map, parcel map, or condominium plan. The area within these boundaries may be filled with air, earth, or water, or any combination thereof, and need not be physically attached to land except by easements for access and, if necessary, support. . . ."

This definition of a "condominium," derived from former Civil Code section 783, as amended in 1984, carried forward the changed description of a condominium, so that it no longer required the existence of a structure or building.

### B. *Civil Code Section 1646 Is Inapplicable*

Edwards relies on the original definition of "condominium," as set forth in the pre-1984 versions of Civil Code section 783. He strenuously argues that that definition requires a condominium to consist of a structure or building. Edwards further argues that, pursuant to Civil Code section 1646, contracts—here, the Bear Creek CC&R's—must be construed according to the law and usage "of the place" where the contract was made.[1] This "place," Edwards maintains, is pre-1984 California; thus, the term "condominium," according to the "law and usage" of California before 1984 must be construed to require an actual structure. The Bear Creek CC&R's were created before 1984, and should therefore be subject to the pre-1984 definition in Civil Code section 783.

Edwards's reliance on Civil Code section 1646 is misplaced. He is attempting to import a "law of time" rather than a "law of place" into the CC&R's as a contract or instrument. Whether pre- or postamendment law is applied, the CC&R's properly apply the law of place where the contract was created or intended to be performed: i.e., California. Civil Code section 1646 is irrelevant to the question whether the new definition of "condominium" under California law applies to the Bear Creek CC&R's.

### C. *The New Definition of "Condominium," Not Requiring a Structure, Applies to Edwards's Property*

The Davis-Stirling Act by its own terms applies to all common interest developments, even those that were created before the act was adopted. (Civ. Code, § 1352; *Villa de las Palmas Homeowners Assn. v. Terifaj*

---

[1] Civil Code section 1646 states: "A contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."

(2004) 33 Cal.4th 73, 81, fn. 2 [14 Cal.Rptr.3d 67, 90 P.3d 1223]; *Nahrstedt v. Lakeside Village Condominium Association* (1994) 8 Cal.4th 361, 378, fn. 8 [33 Cal.Rptr.2d 63, 878 P.2d 1275].) Civil Code section 1352 states in relevant part: "This title applies and a common interest development is created whenever a separate interest coupled with an interest in the common area or membership in the association is, *or has been*, conveyed . . . ." (Italics added.)

Edwards's attempts to avoid the application of the Davis-Stirling Act to his property by arguing that he acquired no fee simple estates in the deed by which he took title to units 9 through 16 of CCV phase IV. He contends that the Trust owns an "undivided parcel of land [which] has not yet been divided into separate interests." Thus, Edwards contends, the Trust does not own any "condominiums," defined as consisting both of an "undivided interest in common in a portion of real property," together with "a separate interest in space . . . ." (See Civ. Code, § 783.)

Edwards's argument is disingenuous. The deed by which the Trust received title recites that the property received *does* qualify as a "condominium"—eight of them, in fact—consisting of both an "undivided interest" in common areas and a fee simple interest in a condominium unit.

Edwards's deed conveyed an "undivided 8/16th fractional interest" in the common areas of "lots 1 and 2 of Tract Map 20829, in the County of Riverside, State of California, as per map recorded in Book 161, pages 3 through 4, inclusive, of Maps, in the Office of the County Recorder of said County." The undivided (common) interest in lots 1 and 2 of tract map 20829 specifically *excluded*, "all *living units and garages* shown upon Country Club Villas-Phase 4 Condominium Plan recorded in the Office of the County Recorder of Riverside County, California on September 9, 1986 as Instrument No. 219590." (Italics added.) In other words, the "undivided interest" conveyed in lots 1 and 2 of tract map 20829 *included* common areas and *excluded* the condominium units themselves, which were to be owned exclusively by their owners/occupiers: i.e., the fee simple portion of the condominium unit.

Edwards purchased eight such condominium units: units 9 through 16, with the exclusive right to use, possess and occupy those units. That Edwards owns more than one unit does not detract from Edwards's exclusive right, in fee simple, to occupy the living unit and garage areas for units 9 through 16, *as described on the CCV phase IV condominium plan.* Indeed, there would be utterly no point in describing Edwards's title to "Living unit and garage Nos. 9 through 16 as shown upon the condominium plan," if the deed did not convey a fee simple interest in those condominium units.

Edwards's argument that the *land itself* is "undivided," is an example of the logical fallacy of "equivocation," in which he has shifted the meaning of the word. The "undivided interest" conveyed in the deed is ownership, held in common with all the other owners in lots 1 and 2 of tract map 20829, to the *common areas* in lots 1 and 2. The condominium areas—the living units and garages as described in the condominium plan—are specifically excluded from the description of Edwards's "undivided interest." That Edwards has not sold any individual units—whether constructed or not—is wholly irrelevant to the existence of both an undivided (common) interest and a fee simple (exclusive) interest, which comprise a condominium. The eight units Edwards acquired meet the statutory definition of a "condominium" under the Davis-Stirling Act, inasmuch as they are specifically described in a qualifying condominium plan, the CCV phase IV plan as described in Edwards's deed. Edwards has failed to demonstrate that the Davis-Stirling Act does not apply to his condominium units.

### D. *Edwards Was Not Entitled to a Directed Verdict*

Inasmuch as we have concluded that the Davis-Stirling Act, and its definition of a "condominium," applied to Edwards's property, we necessarily also conclude, as did the trial court, that Edwards owns eight condominiums. In light of this conclusion, we categorically reject Edwards's initial contention, that the trial court erred in denying a motion for directed verdict, premised on the notion that Bear Creek could not prove the existence of any condominiums for which assessments were payable. Bear Creek did prove the existence of eight condominiums; Edwards was not entitled to a directed verdict.

### E. *Edwards Had a Duty to Pay Assessments*

Under both the Davis-Stirling Act and the Bear Creek CC&R's, assessments become due upon all units in a phase after the first unit in a phase has sold. The evidence at trial was uncontradicted that the first unit in CCV phase IV sold no later than 1986, long before Edwards acquired his units. This event triggered the duty of each owner of a unit in that phase to pay assessments. The CC&R's declared, "The Annual Assessments . . . shall commence as to all lots (including those owned by Declarant) on the first day of the month following the conveyance of the first lot by Declarant to an individual Owner; provided however, that annual assessments shall commence for all Lots located within a phase of the Properties which has been annexed hereto on the first day of the month following the conveyance of the first lot in such phase by Declarant to an individual Owner. . . ." CCV phase IV had been annexed into the Bear Creek master development in August of 1986.

The evidence was therefore without dispute that the triggering events—annexation and first sale of a lot to an individual owner—had taken place with respect to CCV phase IV. Thereafter, Bear Creek at all times charged annual assessments against each unit in CCV phase IV, whether or not the unit had been built out.

Edwards owned eight units in CCV phase IV. Edwards therefore owed a duty under both the Davis-Stirling Act and the Bear Creek CC&R's to pay those assessments, regardless of the absence of an actual condominium structure or building. The definition of a "condominium" as a unit of space, which space may consist of air, water or earth, in no wise requires an actual structure or building; rather, it requires a specific description in a particular kind of qualifying recorded instrument. Such an instrument (condominium plan) exists here. As a matter of law, based upon statutory construction, interpretation of the written CC&R's, and undisputed facts, the Trust owed a duty to pay assessments to Bear Creek for each of the eight condominium units it owned.

### F. Edwards Failed to Pay Any Assessments

The evidence was undisputed that the Trust at all times failed and refused to pay any assessments for any of its condominium units. The evidence was further undisputed as to the amounts of the regular assessments charged and which remained unpaid. As a matter of law, therefore, Bear Creek had demonstrated that Edwards owed a duty to pay assessments and had failed to do so. Bear Creek was therefore entitled to pursue its enforcement remedies under the CC&R's.

## II. Bear Creek Properly Gave Notice of Its Liens

Edwards next complains that Bear Creek failed to comply with the statutory notice requirements for filing its liens against Edwards's lots.

### A. Notice Was Given to the Owner at the Owner's Designated Address

More specifically, Edwards argues that Bear Creek "never complied with notice requirements to Edwards, the only person entitled to notice." He contends that the notices sent to him at Attorney Enriquez's address were of no effect, because he never designated her as his agent; he further asserts that Bear Creek should not have been permitted to present evidence on the issue of agency, because that issue was not specifically alleged in Bear Creek's complaint.

### 1. *Notice Was Mailed to Edwards (the Owner) at the Address Selected by Both Edwards and His Attorney*

The claim that Edwards did not receive proper notice is disingenuous. Attorney Enriquez's address was the address listed on Edwards's title deed to the property. Bear Creek consistently sent information, mailings, requests and notices to Edwards at Attorney Enriquez's address. Attorney Enriquez consistently responded, on Edwards's behalf, to these mailings, requests and notices.

For example, Bear Creek first sent notice of the overdue assessments *to Edwards* (i.e., to "Edward Trust" [*sic*]—the record owner—by name), in care of Attorney Enriquez, on February 27, 1998. Attorney Enriquez, using her own letterhead, replied on behalf of Edwards, advising Bear Creek that Edwards "dispute[d] [the] 'Notice of Past Due Assessments,' " on the bases both that Edwards had never received an initial statement concerning assessments on the property, and that there were no structures on the property. Notably, Attorney Enriquez's correspondence did not advise Bear Creek to use any other address to contact Edwards. Attorney Enriquez also responded on Edwards's behalf in several other instances, and the Edwardses themselves never made any written request to have Bear Creek's correspondence sent to them at any other address.

The only exception was Edwards's request to an unknown person at the gate kiosk for parking decals; the decals were duly sent to his business address. Otherwise, however, Edwards took no steps to prevent Bear Creek from sending its correspondence to him at Attorney Enriquez's address. Indeed, Bear Creek sent ballots to Edwards at Attorney Enriquez's address, which ballots Edwards then personally cast. As to one set of eight ballots, *Edwards himself* filled in Attorney Enriquez's address as the owner's address in the space provided on each ballot. On another set of eight ballots, he again wrote in Attorney Enriquez's address as the owner's address on six of the eight ballots (two ballots left the owner's address space blank). Edwards himself therefore consistently designated Attorney Enriquez's address as the proper mailing address for the Trust, the property owner.

Edwards testified at trial that he had voted the ballots—giving Attorney Enriquez's address as the "owner's" mailing address—in error, or that he had done so only to "protect" his rights. A mere two days after giving this testimony, however, he executed a proxy for each of his eight units, to cast three ballots per unit, or 24 total votes, in the election of Bear Creek's Board of Directors. He faxed this proxy to the designated election inspector, who in

turn cast the ballots as directed by Edwards's proxy instructions. The execution of the proxy was wholly inconsistent both with Edwards's claim that he owned no assessable "units," and with the assertion that Bear Creek was not entitled to correspond with him at Attorney Enriquez's address. Under Bear Creek's CC&R's, only assessable units are entitled to vote in association elections. The notice of the election presumably was not sent to Edwards at any address other than the one Edwards had designated on all the earlier ballots as the Trust's correspondence address: Attorney Enriquez's address. The proxy was faxed from the same fax number that Attorney Enriquez used for her fax communications to and from the court. Edwards attempted to disclaim the proxy, testifying that he had also sent a fax revoking the proxy; he did not say when he sent the revoking fax, however, and the election inspector testified that no such revocation was received before the close of the election. Notably also, Edwards produced no document to substantiate his claim that he had revoked his proxy. (In addition, Edwards's testimony failed to explain why he had faxed his election proxy in the first place, had he truly believed he had no assessable lots, and thus was not entitled to vote in any Bear Creek elections.)

Civil Code section 1367, subdivision (a), provides in relevant part that, "[b]efore an association may place a lien upon the separate interest of an owner to collect a debt which is past due under this subdivision, the association shall *notify the owner in writing by certified mail* of the fee and penalty procedures of the association, provide an itemized statement of the charges owed by the owner, including items on the statement which indicate the assessments owed, any late charges and the method of calculation, any attorney's fees, and the collection practices used by the association, including the right of the association to the reasonable costs of collection. . . ." (Italics added.)

Manifestly, Bear Creek complied with this requirement. The notice was sent by certified mail to the owner at the address consistently used by the owner and the owner's attorney. Attorney Enriquez refused to sign the certified mail receipts, and the lien notices were returned to Bear Creek. Bear Creek had also sent the lien notices by first class mail, however, and none of the first class mail envelopes were returned.

2. *Notice Cannot Be Defeated by Willful Failure to Accept Certified Mail*

Edwards claims that Bear Creek failed to comply *strictly* with Civil Code section 1367, arguing that "there is no presumption of notice absent a signed certified receipt," citing Code of Civil Procedure section 1020. This argument is again disingenuous. Code of Civil Procedure section 1020 provides that,

"Any notice required by law, other than those required to be given to a party to an action or to his attorney, the service of which is not governed by the other sections of this chapter and which is not otherwise specifically provided for by law, may be given by sending the same by registered mail with proper postage prepaid addressed to the addressee's last known address with request for return receipt, and the production of a returned receipt purporting to be signed by the addressee shall create a disputable presumption that such notice was received by the person to whom the notice was required to be sent."

■ Code of Civil Procedure section 1020 is *permissive*; where a notice is required to be sent by mail, compliance with the mailing requirement *may* be satisfied by sending the notice by registered mail with a return receipt requested. Code of Civil Procedure section 1020 does not *require* mailed notices to be sent by registered mail. Likewise, while a signed return receipt *may* create a rebuttable presumption that the notice was received, the absence of such a signed return receipt does not negate any other presumptions concerning mailed items. Under Evidence Code section 641, "[a] letter correctly addressed and properly mailed is presumed to have been received in the ordinary course of mail."

■ Of course, a presumption of receipt is rebutted upon testimony denying receipt. (*Slater v. Kehoe* (1974) 38 Cal.App.3d 819, 832, fn. 12 [113 Cal.Rptr. 790]; accord, *Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416, 421–422 [100 Cal.Rptr.2d 818].) The presumption of Evidence Code section 641 properly applied here, unless rebutted by a denial of receipt. Attorney Enriquez did not testify, and thus never denied under oath that she had received the lien notices mailed to Edwards at her address. Edwards was in no position to deny receipt of the mail at Attorney Enriquez's address.

Even if we accept for the sake of the argument, however, that the tenor of Edwards's evidence was the intent to deny receipt of the lien notices, "the disappearance of the presumption does *not* mean there is insufficient evidence to support the trial court's finding [i.e., of receipt of notice]." (*Craig v. Brown & Root, Inc., supra*, 84 Cal.App.4th at p. 421, italics in original) " ' "[I]f the adverse party denies receipt, the presumption is gone from the case. [But] [*t*]*he trier of fact must then weigh the denial of receipt against the inference of receipt arising from proof of mailing and decide whether or not the letter was received.*" ' " (*Id.* at p. 422, italics in original.)

Here, the evidence was uncontradicted that Bear Creek mailed the lien notices both by certified mail, as required, and by first class mail. Attorney Enriquez refused to sign for the certified letters, and those letters were returned by the post office. The first class letters were not returned, however. The correspondence from Attorney Enriquez, on Edwards's behalf, plainly

demonstrated knowledge of the disputed assessments. The inference is inescapable: Attorney Enriquez in fact received all the notices, but simply refused to accept the certified mail.

The requirement to send the lien notices by certified mail cannot be defeated by the simple expedient of refusing to sign the return receipt. "Where a statute provides for service by registered or certified mail, the addressee cannot assert failure of service when he wilfully disregards a notice of certified mail delivered to his address under circumstances where it can be reasonably inferred that the addressee was aware of the nature of the correspondence." (*Hankla v. Governing Bd.* (1975) 46 Cal.App.3d 644, 655 [120 Cal.Rptr. 827].)

### 3. *The Notice Was Properly Served, Whether Regarded as Served on the Owner or on the Owner's Agent*

That "agency" was not specifically pled is a red herring. First, Edwards consistently designated a certain address as the Trust's (owner's) address for correspondence with Bear Creek. That the designated address happened also to be Attorney Enriquez's address does not defeat the evidence that notice was given to the owner at the owner's designated mailing address.

Second, the evidence also supported the view that Enriquez was Edwards's agent with respect to any correspondence with Bear Creek. Either Enriquez was Edwards's actual agent, or she was his ostensible agent. "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess." (Civ. Code, § 2317.) Here, all of Edwards's and Enriquez's actions intentionally or negligently fostered the belief that Enriquez's address was the owner's address for purposes of all correspondence from Bear Creek and that Enriquez was empowered to act on Edwards's behalf with respect to the CCV phase IV property and the disputed assessments. As the trial court remarked, "it appears to the court . . . that when it's convenient to use Miss Enriquez and her address, that's what they do. And when it is not convenient, then there is a disclaimer that Miss Enriquez has no [*sic*; any?] authority to act on his behalf. Mr. Edwards . . . will be estopped from making that claim."

The issue of agency, if any, was not an issue "outside" the pleadings. (Cf. 4 Witkin, Cal. Procedure (4th ed., 1997) Pleading, § 488, p. 579; 5 Witkin, Cal. Procedure, *supra*, Pleading, § 873, p. 330 ["In actions by a principal on a *contract* made by the agent, that pleading [i.e., the fact of agency] is unnecessary; it is sufficient to allege [the ultimate fact] that plaintiff and defendant entered into the contract"].) The issue to be tried was notice. The issue of notice necessarily encompasses evidence of the means by which

notice was accomplished. Inasmuch as notice may be accomplished either directly or through an agent, the evidence adduced was within the issues raised by the pleadings.

Edwards was properly served with the lien notices in compliance with Civil Code section 1367.

### B. *The Court Properly Determined the Amount of the Lien Assessments*

In connection with the attack on the propriety of the lien notice, Edwards asserts that the amount of the lien must be limited to the amount initially stated in the notice; in other words, Edwards argues that no "recurring liens" are authorized under Civil Code section 1367, and that Bear Creek's recovery must therefore be limited to the amount stated in the initial lien notice, or $484.54 per lot. (We note, as an aside, that each of the notices actually specified $587.08 as the amount of delinquent assessments; together with costs, $879.58 was the amount sought per lot for unpaid assessments, to the date of notice.)

We are not persuaded. Civil Code section 1367, subdivision (b), provides in relevant part, "The amount of the assessment, plus any costs of collection, late charges, and interest assessed *in accordance with Section 1366*, shall be a lien on the owner's interest in the common interest development from and after the time the association causes to be recorded with the county recorder of the county in which the separate interest is located, a notice of delinquent assessment . . . ." (Italics added.)

Civil Code section 1366, in turn, refers to provisions for assessments in an association's "governing documents," such as the Bear Creek CC&R's. Article V, section 11(b), of the Bear Creek CC&R's provides that a lien includes: "[t]he total amount claimed to be due and owing for the amount of delinquency, interest thereon, collection costs, and estimated attorneys' fees." It further provides that "any demand or claim of lien or lien on account of prior delinquencies *shall be deemed to include subsequent delinquencies and amounts due on account thereof.*" (Italics added.) The recorded lien notices, also mailed to Edwards, included the statement that, "[a]dditional monies shall accrue under this claim at the rate of the claimants' regular monthly or special assessments, plus permissible late charges, costs of collection and interest, accruing subsequent to the date of this notice."

As Bear Creek observes, all of the sums included on the liens and lien notices are authorized by the CC&R's and statutory law. The amounts here determined by the court to be owing as liens are no more than the amounts authorized by the governing documents and statutes.

Pursuant to Civil Code section 1366, subdivision (a), "[c]ondominium homeowners associations *must* assess fees on the individual owners in order to maintain the complexes." (*Park Place Estates Homeowners Assn. v. Naber* (1994) 29 Cal.App.4th 427, 431–432 [35 Cal.Rptr.2d 51], italics in original.) Those fees are statutorily prescribed to be "a debt of the owner . . . at the time the assessment . . . [is] levied." (Civ. Code, § 1367, subd. (a).) "These statutory provisions reflect the Legislature's recognition of the importance of assessments to the proper functioning of condominiums in this state. Because homeowners associations would cease to exist without regular payment of assessment fees, the Legislature has created procedures for associations to *quickly and efficiently seek relief* against a nonpaying owner." (*Park Place Estates Homeowners Assn. v. Naber, supra*, 29 Cal.App.4th at p. 432, italics added.)

Were the relevant provisions to be construed as Edwards suggests, the described statutory purpose of providing for a quick and efficient means of enforcing the CC&R's would be seriously undermined; each month, or at such other intervals as the assessments are charged under a given set of CC&R's, the association would be required to record successive liens. A successive recordation requirement would impose a heavy—and needless—burden upon homeowners' associations, fraught with risk to the association, and undue windfall to the delinquent homeowner, should any installment be overlooked. We are unwilling to construe Civil Code section 1367 to require such an oppressive burden. Both delinquent homeowners and the public at large are placed on notice, with the recordation of the initial assessment lien, that subsequent regularly and specially levied assessments, if they continue unpaid, will accrue in due course. The purpose of the lien notice and recordation will have been served, and the association's remedy justly preserved, by the initial recordation of lien.

Inasmuch, also, as Edwards has admitted that the assessments, charges, and other moneys due and owing under the CC&R's have never been paid, we find no error in the court's determination of the amounts due.

III.–VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1470.

## DISPOSITION

The trial court is ordered to strike from its statement of decision the findings that Bear Creek was not guilty of unclean hands or fraud. The amendment to the statement of decision in no wise affects the validity of the judgment, however. The judgment is in all respects affirmed. The appeal from the postjudgment order setting the amount of the security deposit on appeal is moot. Costs on appeal are awarded to Bear Creek as the prevailing party on appeal.

McKinster, Acting P. J., and King, J., concurred.

A petition for a rehearing was denied August 3, 2005, and appellants' petition for review by the Supreme Court was denied October 19, 2005. Kennard, J., did not participate therein.