Filed 5/10/16  Whitehawk Ranch at Hubbard  Homeowner Assn. v. Bolin CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| WHITEHAWK RANCH AT HUBBARD HOMEOWNER ASSOCIATION,<br><br>    Plaintiff, Cross-Defendant and Respondent,<br><br>    v.<br><br>NGOZI E. BOLIN et al.,<br><br>    Defendants, Cross-Complainants and Appellants;<br><br>    v.<br><br>CRAIG A. SMITH et al.<br><br>    Cross-Defendants and Respondents. | B252717<br><br>(Los Angeles County<br>Super. Ct. No. PC049801) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Randy Rhodes, Judge.  Affirmed.

The Bolin Firm, and Ngozi E. Bolin for Defendants, Cross-Complainants and Appellants.

SwedelsonGottlieb, David C. Swedelson and Joan E. Lewis-Heard for Plaintiff, Cross-Defendant and Respondent Whitehawk Ranch at Hubbard Homeowner Association, and for Cross-Defendants and Respondents Craig A. Smith, Noelle D. Crabtree, and Charlanne M. Huber.

Appellants Ngozi Bolin and James Olen cross-claimed for money damages against respondent Whitehawk Ranch at Hubbard Homeowner Association (hereafter the Association).[1] Bolin and Olen claimed that their damages resulted from homebuilding delays caused by the Association's wrongful interference. The cross-claims by Bolin and Olen were tried to the trial court which entered a judgment in favor of the Association, including an award of roughly $375,000 to the Association for its attorney's fees. On appeal, Bolin and Olen contend the trial court misinterpreted the Association's covenants, conditions and restrictions, and, further, that the court failed to decide all of the claims that Bolin and Olen alleged in their cross-pleading. We affirm.

## FACTS

### Background

The Association is a non-profit, mutual benefit corporation that manages the residences and common areas in a neighborhood tract known as Whitehawk Ranch in the Sylmar area of the City of Angeles. In 1987, the developer of the Whitehawk Ranch tract recorded a "Declaration of Establishment of Covenants, Conditions, and Restrictions" (CC&Rs) for the tract. The stated purposes of the CC&Rs include the enhancement and protection of the value, desirability, attractiveness, and general quality of life of the properties in the Whitehawk Ranch tract. To this end, Article VI of the CC&Rs authorizes the Association's board of directors to enforce community standards as set forth in the CC&Rs.

Article V of the CC&Rs governs the subject of "Architectural Control" within the Whitehawk Ranch tract. Section 1 of Article V provides that homeowners in the tract are required to submit plans to an "Architectural Committee"[2] consisting of three persons

---

[1]    Our references to the Association include three individual members of its board of directors, respondents Craig Smith, Noelle Crabtree, and Charlanne Huber. These individual board members will be noted in this opinion only as needed for clarity.

[2]    The parties' briefs more frequently use the term "Architectural Control Committee" or ACC. We will do likewise for the sake of continuity.

appointed by the Association's board of directors, and to obtain the ACC's approval, before making any improvements to their properties.**3** Further, Section 1 of Article V provides:

> "Approval shall be based, among other things, upon [1] conformity of external design, conformity with such rules and regulations as may be adopted by the [ACC] in accordance with the Article, and [2] conformity of the plans and specifications with the purpose, general plan and intent of [the CC&Rs]."

Various additional sections in Article V prescribe the general governance, duties and responsibilities of the ACC. For example, Section 5 of Article V states that persons appointed to the ACC by the board of directors "must be members [of the Association] or persons authorized in writing by the board to serve on the [ACC]." Further, Section 6 of Article V states that "[n]o appointment to or resignation from the [ACC] shall become effective until an instrument evidencing same has been recorded in the office of the County Recorder . . . ." At trial, undisputed evidence established that it has always been impossible to comply with this latter provision inasmuch as the County Recorder does not accept any such instrument for recording. No other formalities for appointment or resignation of person to the ACC are prescribed in the CC&Rs.

Finally, Section 10 of Article V is of particular importance to the current case. It provides:

> "The [ACC] may, from time to time, in its sole discretions [*sic*], adopt . . . reasonable architectural standards and rules and regulations interpreting and implementing the provisions [of the CC&Rs] and establishing reasonable architectural standards and rules and regulations for the Property."

---

**3** The CC&Rs provided that, for an initial specified period, the developer would appoint the members of the ACC. That initial period has long since expired, and the subject of developer-appointed persons to the ACC has no relevance to the current case.

### The Purchase of the Home and the Fire

In October 2007, Bolin and Olen purchased a house within the Whitehawk Ranch tract subject to the Association's CC&Rs.[4]  Bolin knew that the property was within an area with a homeowners association because she purchased the property subject to a lien placed on the property by the Association due to the seller's prior delinquency of his homeowner association fees.  She believed that the realtor, who was representing both her and the seller, requested a copy of the CC&Rs, but she did not recall receiving a copy of the CC&Rs at the time she purchased the property.

During 2008, Bolin made a number of improvements to her property, including changes to the garage door, exterior doors, landscaping, and repaving the driveway. She made these improvements without seeking or receiving approval from the Association's ACC.

In November 2008, Bolin's house burned down in what is known as the Sayre Fire.

### The Dispute

By January 2009, Bolin had contacted an architect, James Meyers, about starting the process of re-building a new house on her property, and signed a contract to retain him for the project.  In February 2009, Bolin and Meyers had a "first kickoff meeting" to discuss her "wishes and desires for the project."  At trial, both sides agreed that Meyers' design for Bolin's new house were not for a "traditional Mediterranean revival" style house as were the other original houses in the Whitehawk Ranch tract.  The renditions of Bolin's new house depicted a modern-style house with steep angles, and a roof and layout different than the original houses in the tract, where most have a "Spanish look" with red tile roofs.  Still, architect Meyers testified at trial that it was his view that

---

[4]  In their cross-pleading, Bolin and Olen alleged they were the owners of the subject property at all relevant times.  At trial, Bolin alone testified about the events surrounding the purchase of the house, and a subsequent fire which burned it to the ground, and the efforts to rebuild.  From this point on in the opinion, we use Bolin collectively to include Olen, as we find this more easily corresponds with Bolin's testimony.  Our shorthand has no bearing on the issues in the case.

4

Bolin's new house met the "conformity criteria" in the Whitehawk Ranch tract as the exterior was to be coated with a material that had a similar appearance as stucco and which could be painted any color that was appropriate to fit with nearby houses, and that the roof, while not Spanish tile, would have had a red color that would "blend" with the tiles roofs in the area.[5]

With the assistance of her architect, Bolin sought and received local government approval for her hew house. It is undisputed that Bolin did not submit the plans for her new house to anyone affiliated with the Association, or to the Association's ACC, such as it existed at the time, a subject we will discuss more fully in the content of this opinion. In addition, she did not receive approval from the Association or its ACC, before proceeding with her preparations for rebuilding.

On March 12, 2009, the Association sent a letter to Bolin asking that she advise it of her intentions as to rebuilding a new house on her property, and expressing that it had "a few concerns" about the subject. The letter specifically advised Bolin: "All plans for roof tile type or color, exterior color, or building structure must be submitted to the [Association's] Board for review and approval prior to undertaking any such repair, replacement, rebuilding, or re-construction of your home to ensure they are consistent with the general appearance of the tract."

On April 15, 2009, roughly a month after the Association's initial notice to Bolin that she was required to submit her building plans for approval, the five members of the Association's board of directors, stating that they were acting as the Association's ACC (*ante*) voted unanimously to approve a resolution as follows: " . . . ADOPTION OF ARCHITECTURAL CONTROL RULES REGARDING THE EXTERIOR APPEARANCE AND STRUCTURE OF HOMES IN THE WHITEHAWK RANCH TRACT." The April 15, 2009 resolution included the following provision, among others:

> "BE IT FURTHER RESOLVED: That the [Association's] Board *has been and shall continue to act in place and instead of* the Architectural

---

[5] The design of the new house would not have supported the structural weight of a tile roof.

5

Control Committee ('ACC') pursuant to its powers and authority as set forth in Article VI, Duties and Powers of the Association, [and] are hereby authorized and empowered to execute the rights, duties and responsibilities of the ACC pursuant to Article V, Architectural Control, of the CC&Rs." (Italics added.)

Attached to the April 15, 2009 resolution was a three-page document entitled "ARCHITECTURAL CONTROL STANDARDS AND RULES REGARDING THE EXTERIOR APPEARANCE AND STRUCTURE OF HOMES IN THE WHITEHAWK RANCH TRACT" (hereafter the Architectural Standards). The Architectural Standards specified the types of trim colors, exterior wall paint colors, and driveway appearance. Further, they provided that any re-building or re-modeling of any house in the tract that materially changed the original structure of the house as it appeared prior to November 1, 2008, had "to be consistent with that of the original or existing structure's appearance and style . . . ." The final provision of the Architectural Standards stated that they had been "accepted and adopted by the [Association's] Board acting as the Architectural Control Committee . . . ." The Architectural Standards were signed-off-on by five individuals who were then sitting members of the Association's board of directors.

On April 16, 2009, the Association sent another letter to Bolin stating: "Please do not forget to have your new house plans approved by the Architectural Committee prior to the start of building." In June 2009, Bolin sent a letter back to the Association stating that the then-newly-adopted Architectural Standards were "illegal." On August 25, 2009, the Association sent another letter to Bolin asking her to explain why she believed that the Architectural Standards were illegal. The specifics of the events that transpired over the following several months is not altogether clear from the record.

In early April 2010, construction workers poured the foundation for Bolin's new house. In September 2010, the Association sent a letter to Bolin's architect, James Meyers, asking him to provide a copy of the plans for Bolin's new house to the "Board/Architectural Committee" so that the plans could be reviewed and approved. According to the testimony of architect Meyer at trial, he "had no indication" that there

6

was a homeowner association in the Whitehawk Ranch tract until he received the September 2010 letter.

***The Litigation***

In December 2010, the Association filed a complaint against Bolin alleging an overall claim for violation of the Association's CC&RS, and praying for injunctive and declaratory relief. The fundamental allegation in the Association's complaint was that Bolin had started building a new house, "without . . . obtaining the required approval from the Architectural Committee, in violation of the CC&Rs." The Association prayed for injunctive relief ordering Bolin to cease all construction work on her new house "until such time as [she] submitted the appropriate architectural plans, and receive[d] written approval" from the Association. On December 15, 2010, the trial court granted the Association's ex parte application for a temporary restraining order, and set a hearing on the Association's motion for a preliminary hearing for February 2011.

In January 2011, Bolin filed an answer to the Association's complaint. At the same time, Bolin filed a cross-complaint against the Association. Bolin's original cross-complaint is not in the record on appeal, which consists of an appellant's appendix and a respondent's appendix.

Meanwhile, Bolin submitted her plans for her new house. On January 19, 2011, three members of the Association's board of directors, stating they were acting as the ACC, voted to "disapprove" Bolin's plans. The three members of the Association's board who stated they were acting as the Association's ACC and who voted to reject Bolin's plans for her new house were cross-defendants and respondents Craig Smith, Noelle Crabtree, and Charlanne Huber. As far as we can ascertain from the record before us on Bolin's current appeal, she never initiated a challenge to the ACC's decision to deny approval of the plans for her new house, for example, by a petition for writ of administrative mandate.

On February 14, 2011, the trial court issued a preliminary injunction ordering Bolin, her contractors and all persons acting for or on her behalf or in concert with her to cease construction work on her property until such time as he submitted construction and

architectural plans to the ACC, and received written approval of her plans from the ACC. Further, the court ordered the Association to post a bond in the amount of $100,000 to cover any damages suffered by Bolin in the event the court subsequently determined that permanent injunctive relief was not warranted. (See Code Civ. Proc., § 529, subd. (a).)

In April 2012, Bolin filed a third amended cross-complaint (TAXC) against the Association and the individual members of the ACC who had voted to disapprove her plans for her new house. The TAXC alleged the following causes of action, listed respectively: breach of contract – the Association's CC&Rs; declaratory relief; breach of covenant of good faith and fair dealing; breach of fiduciary duty; constructive fraud; fraud and deceit; intentional infliction of emotional distress; negligent infliction of emotional distress; violation of the Unruh Act (see Civ. Code, § 51) based on race in that Bolin is of "African descent;" and violation of California Solar Rights Act (see Civ. Code, § 714 et seq.). The Association filed a timely answer to the TAXC.

In May 2012, the trial court denied, for a variety of reasons, the Association's motion for summary judgment (MSJ), including that the moving papers had not addressed all of the causes of action alleged in Bolin's TAXC. As stated by the court: "If issues presented by the TAXC are ultimately determined in favor of [Bolin], it could affect whether plans which [she] eventually submitted . . . are deemed appropriate and could affect [her] responsibility for payment of attorneys' fees to [the Association]. Since [the Association] has failed to adequately address all these issues, triable issues of material fact are found to exist as to whether [the Association] is entitled to judgment as a matter of law."

In January 2013, the case came on for trial. The Association and Bolin waived a jury. In the course of an ensuing series of exchanges with the trial court, Bolin's counsel indicated that she would be dismissing her ninth and tenth causes of action for violation of the Unruh Act and the California Solar Rights Act. Further, Bolin's counsel stated that Bolin would "be proceeding with [her] case in chief, which is the violation of the CC&Rs and the related damages, collateral tort damages, which is breach of the covenant of good

8

faith and fair dealing, the element of fraud. And misrepresentation that are set forth in [the] cross-complaint. And damage as well."

During continued discussions of a trial management nature, the lawyers for both sides explained to the trial court that they had been working to "streamline" the case for a shorter trial, and the following exchanges ensued:

"[Counsel for the Association]: The reason I had suggested that the order of proof that we just move on the cross-complaint is because it's not disputed that the CC&R stated [what] they do. What's at issue is whether they were required to get approval. And so that's what's going to trial. Not the discrimination. Not the solar, but whether the Association acted properly in requiring them to seek approval.

The Court: So whether the CC&Rs . . . affected the Bolins, is what you're getting at? I'm not quite sure [where] we're going down with that.

[Counsel for Bolin]: This is essentially an *Ironwood* case [*Ironwood Owners Assn. IX v. Solomon* (1986) 178 Cal.App.3d 766 (*Ironwood*)], your Honor. This is a case where the management or the board did not follow the rules, went behind the rules and adopted architectural standards without following the rules or appointing an architectural committee in doing it after they were told that we had a permit and we were rebuilding our house. We are concerned that the actions that they took were beyond the scope of their power. And then the actions that they did take were unreasonable as well.

"[¶] . . . [¶]

[Counsel for the Association]: That's essentially what the cross complaint's about. We, of course, deny the allegations.

The Court: I just don't want to come back on Wednesday and then be discussing walking on the moon.

[Counsel for the Association]: No.

[Counsel for Bolin]: I'm just not that creative, your honor.

9

The Court: I appreciate that. But so far everyone's been awful creative in this case. There's been a lot of confusion as a result of it.

[Counsel for the Association]: I think if you look at the motion for summary judgment that we filed [and] their opposition, we presented that they were required to get approval and their opposition was no, we were never required to get approval, you couldn't make us get approval. I think that's what the case is about. Streamline to its – now to taken out those two causes of action that's basically what it is.

The Court: Great. That's what we'll hear. And the time estimate for that is? Two days?

[Counsel for Bolin]: Three days. I would run really fast. We could get it done.

The Court: So you're going to be in essence the moving, Plaintiff, party then?

[Counsel for Bolin]: To the extent that his case is very short, yes.

The Court: Okay.

[Counsel for the Association]: Our case is . . . you say get approval, got approval. Their case is we don't have to get approval for various reasons."

Witnesses testified over several days during January 2013. The primary witnesses on Bolin's side were Bolin, her architect, James Meyer, and a real estate expert on the operations of homeowner associations, Alan Schantz. The primary witnesses on behalf of the Association were the three members of board of directors who had acted as the ACC with regard to Bolin's new house, Craig Smith, Noelle Crabtree, and Charlanne Huber, and an expert on homeowner associations, attorney Peter Racobs. At the end of witnesses' testimony, the trial court invited the parties to submit closing argument briefs to assist the court in fashioning a statement of decision. Bolin's closing argument brief is not part of the appellate record. On April 2, 2013, the Association submitted its closing argument brief.

10

On May 23, 2013, the trial court issued an initial statement of decision. Both parties filed objections to the initial statement of decision; the Association objected to the portion of the initial statement of decision which stated that the Association had "dismissed its entire action" against Bolin at the outset of trial.

On June 21, 2013, the trial court issued its final statement of decision. The final statement of decision includes the following language: "At the outset of trial, all parties agreed that trial would proceed solely on Bolin' claims against [the Association] for monetary damages . . . arising from her alleged frustrated efforts to rebuild [her] home after it had been destroyed by fire." The court then outlined its stated reasons for its conclusion that the Association, including its ACC, had acted reasonably in requiring Bolin to submit her plans for her new house to the Association, including its ACC.

On July 23, 2013, the trial court signed and entered a judgment in favor of the Association and against Bolin and Olen. The judgment states that a judgment of dismissal is entered "on the cross-complaint;" the judgment is silent as to the Association's complaint. Costs were subsequently entered on the judgment in the sum of $12,998.34 on the Association's memorandum of costs and hearing on a motion to tax costs. Later, attorney's fees in the amount of $378,712.50 were entered on the judgment following a hearing on the Association's motion to be determined the prevailing party and for an award of attorney's fees.

Bolin and Olen filed a timely notice of appeal from the judgment. The Association thereafter filed a cross-appeal from the judgment, apparently to challenge the trial court's ruling that the Association had dismissed its complaint at the outset of trial. Shortly after the trial court issued its order awarding attorney's fees, Bolin and Olen filed a second notice of appeal. Our court consolidated the two appeals. The appeal was stayed for a number of years due after Bolin and Olen filed a bankruptcy proceedings. In September 2015, Bolin and Olen notified our court that the bankruptcy court was in the process of dismissing the bankruptcy case, and that it was their "intention to accept the rulings of the bankruptcy court." Thus, the appeal is now properly before our court.

11

## I.      The Contended Error Over the CC&Rs

Bolin contends judgment in favor of the Association must be reversed because trial court legally erred in concluding that the Association had acted "reasonably" under the Association's CC&Rs when it came to the operations of the Association's ACC. She argues the trial evidence established, without room for dispute, that the Association "did not follow . . . the procedures spelled out in [its] CC&Rs to appoint a three-member ACC to develop enforceable Architectural Standards." Further, she argues the evidence shows that the members of the Association's board of directors, not a properly constituted ACC, adopted standards "drawn up unilaterally" by the chairman of the Association's board of directors, Craig Smith. In other words, Bolin essentially argues that the Association never properly appointed an ACC which performed the task, acting as a duly appointed committee, of giving meaningful evaluation to proposed architectural standards and then adopting a set of standards that the ACC deemed appropriate. As stated by Bolin: "[T]o enforce [any] Architectural Standards under the CC&Rs, the [Association's] board [of directors] must obey the processes and procedures specified in those very same CC&Rs regarding the creation of an ACC and Architectural Standards." Implicit in Bolin's arguments is the proposition that because the Association's board of directors did not validly establish an ACC that in turn validly adopted the Architectural Standards that were applied to her, the Association (whether acting for itself or as the ACC) did not have any lawful authority to enforce the Architectural Standards that were applied to her. All of this means that she had a valid claim for damages resulting from the application of Architectural Standards to her. We are not persuaded.

### *The Composition of the ACC*

The record supports the trial court's conclusion that members of the Association's board of directors properly acted in the role of members of the Association's ACC. The trial testimony of the Association's expert, attorney Peter Racobs, included repeated explanations that there is no law, and no provision in the Association's CC&Rs, that prohibited the members of its board of directors from sitting as members of its ACC.

12

As Racobs explained, nothing in the law or practice governing the functions of a homeowner association, including the CC&Rs involved in the current case, required that the members of an association's board of directors, and the members of any committees that are formed to assist the board of directors in performing their governing duties, must be comprised of different individuals. Further, it is not uncommon for members of an association's board of directors to sit on the association's committees, particularly when there are few or no volunteers to sit on such committees, a not uncommon occurrence, and an occurrence which was present in the case of the Whitehawk Ranch tract. The expert presented by Bolin, Alan Schantz, when asked on cross-examination whether he could point to any provision in the CC&Rs involved in this case that barred members of the Association's board of directors from appointing themselves to serve as a member of the ACC, could not do so. He merely stated that he saw no provision in the CC&Rs which expressly stated that board members could do so. We are satisfied that the judgment in this case is not subject to reversal based on any error concerning the *persons* who acted as members of the Association's ACC.

This brings us to Bolin's arguments on appeal concerning the *number* of persons who served as the Association's ACC. Here, Bolin proffers a series of arguments. First, Bolin argues that the trial court's judgment is erroneous because the court "never explained" how it was lawful for *five* members of the Association's board of directors to have acted as members of the Association's ACC in April 2009, when it adopted the Association's Architectural Standards, while the Association's CC&RS prescribe that the Association's ACC shall consist of *three* members. Further, Bolin argues the trial court never explained "by what legal means or procedure the five member [ACC] shrunk into a three member ACC" at the time her plans for her new house were rejected by the ACC in January 2011. Bolin concludes by arguing that the Association's CC&Rs do not allow for "'varying numbers'" of members of the ACC, but rather, "specifies three" at all times.

Bolin's arguments do not persuade us. Three of the same members of the Association's board of directors — cross-defendants and respondents Craig Smith, Noelle Crabtree, and Charlanne Huber — acted in the role of the Association's ACC in

13

April 2009 in adopting the ACC's Architectural Standards and in January 2011 when the ACC rejected Bolin's plans for her new house. Two additional members of the Association's board of directors — nonparties Armando and Mari Acevedo — acted in the role of the Association's ACC in April 2009 in adopting the ACC's Architectural Standards, that is, in signing off on the standards. At most, this is a situation involving overdoing matters. As we stated above, it was proper for three members of the Association's board of directors to act as its three-member ACC. We are not persuaded by Bolin's arguments on appeal to reach a legal conclusion that a "varying number" of members created an irregularity which undermined every action taken by the Association's ACC.

There is evidence in the record to support the trial court's factual finding that, "[a]lthough . . . there were varying numbers of [Association board] members at any point over the years, Craig Smith, Nicole Crabtree, and Charlanne Huber were officers and members [of the board] at all relevant times to [Bolin's] matter." Further, the record supports the trial court's legal ruling that it was "reasonable for the board to sit as the ACC as well."

***The Procedural Aspects of the Adoption of the Architectural Standards***

More important in this case in our view than the composition of the Association's ACC are the *procedural aspects* of the architectural standards enforcement activities in Bolin's current case. It is undisputed that the Association's ACC did not formally adopt its Architectural Standards until April 2009, which was after Bolin had already hired an architect to start the process of rebuilding her house, and after the Association (not the ACC) first advised her by letter in March 2009 that she needed to obtain its approval for her rebuilding plans. Further, the Association's own expert, attorney Racobs, testified at trial that it was his view that "procedural errors" may have occurred in the adoption of the Architectural Standards. As Racobs testified at trial: "I felt that the board . . . were out of sequence in [the] adoption of those rules [under the Davis-Stirling Common Interest Development Act. (See former Civ. Code, § 1378, now Civ. Code, § 4765.)] . . . the rules should have been published in draft form, then commented on [by the Association's

14

members], and then formally adopted. They were formally adopted and then published, and then the member comments were received."

In her opening brief on appeal, Bolin argues that all of the architectural standards enforcement activities directed against her by the Association's ACC, acting through certain members of the Association's board of directors, were "not legal" because the Association "did not begin to observe any CC&Rs formalities to create a properly constituted ACC until August 3, 2011." Bolin then extensively argues about efforts by the Association's board of directors during the summer of 2011 to amend the CC&Rs with respect to the governance of the ACC. Bolin argues that, because there was no properly constituted ACC under the CC&Rs before August 3, 2011, "[i]t . . . follows that there were no [valid] Architectural . . . Standards in effect under the CC&Rs after the Sayres Fire in 2009 through 2011, because no proper ACC existed to promulgate any. [¶] The Board, purportedly acting as the ACC, had no *legal* right to block the rebuilding of [Bolin's] new home. The trial court's [finding] that he thought the Board's actions were *factual* [*sic*] *reasonable* is thus irrelevant and very much beside the point."

Again, we are not persuaded. First, we see no relevance in Bolin's discussion of efforts by the Association's board of directors to amend the CC&Rs in August 2011 because no evidence of any new CC&Rs was ever introduced at trial. Any new CC&Rs, even assuming they were later adopted after the case had been filed, were not a part of this case. The trial in this case focused on whether the Architectural Standards adopted by the Association's ACC, acting by certain members of the Association's board of directors, in April 2009 could be enforced. Bolin's arguments do not explain how any efforts to amend the CC&Rs in August 2011 had any effect on the judgment in this case.

Second, it is undisputed at the most foundational level that the Whitehawk Ranch tract is a "common interest" development. Further, it is undisputed that the Whitehawk Ranch tract properties were subject to a set of CC&Rs which were recorded long before Bolin purchased her property. As a matter of law, it is well-recognized that property use restrictions "are an inherent part of any common interest development and are crucial to the stable, planned environment of any shared ownership arrangement." (See *Nahrstedt*

15

*v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 372.) Finally, it is again undisputed that the CC&Rs involved in this case reference an ACC, and expressly state that approval of the ACC for all improvements or rebuilding is required. Use restrictions contained in a set of recorded CC&Rs are afforded a "presumption of validity." (*Id.* at p. 383.) For all of these reasons, Bolin -- at a minimum -- should have involved the ACC from the beginning of the process of rebuilding a new house on her property. If she had, then we would have a very different case. As it is, we are left with this question: did the ACC, acting by members of its board of directors, lawfully demand that Bolin submit plans for her new house to the ACC for approval, either under the Architectural Standards that the ACC adopted in April 2009, or otherwise under the CCRs?[6] We are satisfied that the ACC acted properly in requiring Bolin to submit her plans for approval.

As to the issue of whether the ACC lawfully required Bolin to submit her plans for approval under the Architectural Standards that were adopted in April 2009, we find no error, notwithstanding that those standards were not adopted until four months after Bolin had hired her architect. As the Supreme Court has stated: "'[A]nyone who buys a unit in a common interest development with knowledge of its owners association's discretionary power accepts "the risk that the power may be used in a way that benefits the commonality but harms the individual"'. . . A prospective homeowner who purchases property in a common interest development should be aware that new rules and regulations may be adopted by the homeowners association . . . through the board's rulemaking power . . . ." (*Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73, 85.) Here, even Bolin's own expert on the operations of homeowners

---

[6]     As we read Bolin's opening brief on appeal, she does not contend that the ACC's ultimate decision in January 2011 to deny approval of her plans as being in violation of the ACC's adopted Architectural Standards was not supported by a sufficient showing. Instead, she contends there were no valid Architectural Standards in place, and, thus, she did not need to submit any plans in the first instance or in any event. This case was not set up in the trial court as a challenge to an administrative decision by a governing board, for example, a petition for writ of administrative mandate from the January 2011 decision of the ACC. Bolin's case does not raise a challenge to any administrative proceedings at all.

16

associations acknowledged that the Association and the ACC had rulemaking power. Thus, we find the adoption of the Architectural Standards was a proper function of the ACC, acting through certain members of the Association's board of directors. As to the timing of the adoption of the Architectural Standards, the record shows that they were adopted before Bolin poured the foundation for her new home. The ACC adopted the Architectural Standards in April 2009, and the foundation for Bolin's new house was not poured until April 2010. We agree with the trial court that it was reasonable for the ACC to require Bolin to submit her new house plans for approval under the April 2009 Architectural Standards.

Beyond this, we find the ACC lawfully required Bolin to submit her plans for approval under the CC&Rs. In other words, even assuming the ACC's Architectural Standards adopted in April 2009 are considered to have been invalidly adopted and should be disregarded, we would still affirm the judgment. As explained by the Association's expert at trial, attorney Peter Racobs, regardless of any procedural error in adopting the Architectural Standards, "it didn't make a difference. They didn't need those rules. Article V of the CC&Rs was sufficient authority [to impose a requirement on Bolin, and all of the owners in the Whitehawk Ranch tract, to submit architectural plans for approval]."

Ultimately, we are left to examine Bolin's assertion in the trial court, reiterated in substance on appeal, that her case was "essentially an *Ironwood* case," referring to *Ironwood, supra*, 178 Cal.App.3d 766. We find Bolin's reliance on *Ironwood* to be misplaced.

In *Ironwood*, Bernard and Perlee Solomon purchased a residential lot in a planned development governed by CCRs that granted authority to a local homeowner association (HOA) to enforce the CCRs. The CCRs further required owners in the development to submit all building plans to an architectural control committee for approval, including landscaping plans. Section 4.05 of the CCRs set forth standards for "proposed landscape planning." Four years after purchasing their property, the Solomons planted eight tall date palm trees on their lot. It was undisputed that the Solomons did not submit their

17

plan to plant their palm trees to the architectural committee before they planted their trees. (*Ironwood, supra*, 178 Cal.App.3d at p. 771.)

The HOA filed a complaint for declaratory relief and injunctive relief compelling the Solomons to remove their palm trees, and then filed a motion for summary judgment (MSJ). The trial court granted the HOA's MSJ, and thereafter entered a judgment for an injunction that ordered the Solomons to remove their palm trees. The Court of Appeal reversed, primarily focusing on the context in which the dispute had been addressed. That is, that the dispute had been addressed on an MSJ filed by the HOA on its complaint.

The Court of Appeal concluded that the trial court "ruled correctly that the CCRs require the submission of a plan to the architectural control committee for substantial landscaping changes such as the planting of eight tall date palm trees." (*Ironwood, supra*, 178 Cal.App.3d at p. 771.) It then moved on the crux of the case, which was the MSJ context, in a discussion which reads as follows.

"Despite the [HOA]'s being correct in its contention the Solomons violated the CCRs by failing to submit a plan, more was required to establish its right to enforce the CCRs by mandatory injunction. When a homeowners' association seeks to enforce the provisions of its CCRs to compel an act by one of its member owners, it is incumbent upon it to show that it has followed its own standards and procedures prior to pursuing such a remedy, that those procedures were fair and reasonable and that its substantive decision was made in good faith, and is reasonable, not arbitrary or capricious. ([Citations]; also cf. Code Civ. Proc., § 1094.5.)

"'The criteria for testing the reasonableness of an exercise of such a power by an owners' association are (1) whether the reason for withholding approval is rationally related to the protection, preservation or proper operation of the property and the purposes of the Association as set forth in its governing instruments and (2) whether the power was exercised in a fair and nondiscriminatory manner.' [Citation.]

18

"Several questions of material fact therefore remained before the trial court when it granted [the MSJ] in this case.  First is the question whether the [HOA] followed its own procedures as set forth in the CCRs.  According to the CCRs the [HOA] is governed by a board of directors, but there is nothing in the record showing any decision in respect to this matter by the Association's board of directors.  Secondly, the record does not document and the parties do not indicate that the architectural control committee ever met to consider whether or not the Solomons' palm trees violated the standards set forth in section 4.05 of the CCRs.  The record contains no indication that either the board or the architectural control committee made any findings, formal or informal, as to whether the palm trees met the standard in section 4.05 upon which the disapproval of the palm trees was apparently based.

"There is some indication in the record that the [HOA] attempted to assess the esthetic impact of the palm trees on the community.  The matter was discussed at several meetings, members of the board communicated in writing and over the phone with Bernard Solomon, and at least two 'polls' were conducted to elicit community opinion.  As a matter of law, however, these acts on the part of the [HOA] without appropriate decisions by the governing board or the proper committee did not constitute a reasonable application of the CCRs to the palm trees dispute.  The CCRs carefully and thoroughly provide for the establishment of an Architectural Control Committee and impose upon it specifically defined duties, procedures and standards in the consideration of such matters.  The record as it stands discloses a manifest disregard for these provisions:  whatever decision was made does not appear to be that of the governing body or the committee designated to make the decision; no findings of any sort bridge the analytic gap between facts and the conclusions of the decisionmaker, whoever that was; and the record provides no means for ascertaining what standard was employed in the decisionmaking process.

"To be successful on a motion for summary judgment, the moving party must show it is entitled to judgment as a matter of law.  [Citations.]  Having failed to establish that its actions were regular, fair and reasonable as a matter of law, the [HOA] was not

19

entitled to a mandatory injunction on summary judgment and the trial court erred in granting that relief." (*Ironwood, supra*, 178 Cal.App.3d at pp. 772-773, fns. omitted.)

As one can see from the discussion quoted above, *Ironwood* did not involve any issues concerning the composition of the ACC, nor did it involve a case where a set of architectural standards had or had not been adopted — the architectural standards at issue in *Ironwood* were set forth in the CC&Rs themselves. *Ironwood* does not give guidance on the issue of whether a property owner in a development is required to submit building plans for review — it was accepted on appeal in *Ironwood* that the owners were required to submit their plans.

There is very little in *Ironwood* that is helpful to Bolin in her current case except for the general legal principle that a homeowner association must obey its own rules, that is, it must act reasonably under its own rules, in attempting to enforce applicable land use controls. This principle does not persuade us to reverse the trial court's judgment after the trial in Bolin's case because, as we discussed above, we find that the record supports the trial court's decision that the Association properly adopted the Architectural Standards in April 2009, or that it looked to the CC&Rs themselves, and also reasonably acted in enforcing architectural standards against Bolin by demanding that she submit her plans for approval. We read nothing in *Ironwood* to support Bolin's position that she did not have to submit her plans for approval.

## II.    The Contended Failure to Decide All Claims

Bolin contends the judgment must be reversed because, she argues, "no matter how one looks at it, the trial court never specifically addressed [her] . . . cross claims for declaratory relief regarding the application if the CC&Rs in the circumstances; breach of the covenant of good faith and fair dealing; constructive fraud; fraud and deceit; intentional infliction of emotional distress; and negligent infliction of emotional distress." In this vein, Bolin asserts that "[a]nyone who reads the [final] Statement of Decision would never guess that the trial involved claims for fraud or emotional distress." We find no error.

20

Regardless of the scope of the claims alleged in the Association's complaint or in Bolin's TAXC, it is clear to this court that the parties, through their respective attorneys, agreed that the case would be tried with a much more limited scope than framed by the pleadings. The portions of the reporter's transcript which we excerpted and included in the case history above shows that, at the outset of trial, the Association agreed that it would abandon its complaint, and Bolin agreed to limit the claims in her TAXC. As trial counsel for the Association explicitly stated at the case-management discussions at the outset of trial:

> "I think if you look at the motion for summary judgment that we filed [and] their opposition, we presented that they were required to get approval and their opposition was no, we were never required to get approval, you couldn't make us get approval. I think that's what the case is about. Streamline to its – now [taking] out those two causes of action that's basically what it is."

There was no objection from Bolin's trial counsel to this assessment of the case and the proposed scope-of-trial offered by the Association's counsel. On the contrary, Bolin's counsel had just shortly before advised the court as follows:

> "This is essentially an *Ironwood* case, your Honor. This is a case where the management or the board did not follow the rules, went behind the rules and adopted architectural standards without following the rules or appointing an architectural committee in doing it after they were told that we had a permit and we were rebuilding our house. We are concerned that the actions that they took were beyond the scope of their power. And then the actions that they did take were unreasonable as well."

Given the representations by the parties' attorneys to the trial court, we find no error in the court's statement of decision and judgment. The court decided the matters which were submitted to it to decide.

## III.    The Award of Attorney's Fees

As noted above, the trial court entered an order awarding attorney's fees in the amount of roughly $375,000.  Those fees were incorporated into the judgment which the trial court had previously signed and entered, and from which Bolin filed a timely appeal. Bolin filed a separate timely notice of appeal from the award of attorney's fees.  During the appeal process, we entered an order consolidating the two appeals.  In its respondent's brief, the Association notes that Bolin's opening brief contains no express argument as to the amount or justification for the award of attorney's fees, but rather, attacks only the bases for the underlying judgment itself.  Because we have rejected Bolin's challenges to the bases for the judgment itself, it follows that the award of attorney's fees, which is not challenged by express argument on appeal, must be sustained.

## IV.    The Association's Cross-Appeal

As noted above, the Association objected when the trial court issued its initial statement of decision.  Primarily, the Association objected that the statement of decision suggested that the Association had abandoned its complaint.  The Association asserted that its claim for injunctive relief to compel Bolin to submit plans and get plan approvals remained to be litigated, and thus, the statement of decision incorrectly stated that such a claim had been abandoned.

The trial court's final statement of decision and judgment must be construed, in light of the entire record, to include implicitly a ruling that the Association's complaint was not decided because the Association had abandoned its litigation against Bolin. As noted above, the Association filed a cross-appeal apparently to contest the ruling that it had abandoned its complaint.

The respondent's brief filed by the Association on appeal contains no argument concerning the court's ruling to deem the Association's complaint abandoned, and we construe this to mean that the Association is confirming to our court that it abandoned

its complaint.  We will not consider any suggestion by the Association that this case needs to be remanded for further proceeding on the complaint.[7]

## DISPOSITION

The judgment, including the award of attorney's fees, is affirmed.  Respondents are awarded costs on appeal.


BIGELOW, P.J.

We concur:


FLIER, J.


GRIMES, J.

---

[7]  Of course, were we to construe the judgment to leave open that there still remain further proceedings to be conducted on the Association's complaint, we would see a real problem with the lack of a "one final judgment" in this case.  In that event, we would be inclined to dismiss the entire appeal for lack of appellate jurisdiction.  This we decline to do because the record persuades us that the disputes between the parties were completely finished in the trial court as the parties agreed to frame the case.